# UNITED STATES DISTRICT COURT
# DISTRICT OF COLUMBIA

| | |
|---|---|
| MARIA FARMER, | Case No. |
| | 1:25-CV-01709 |
| *Plaintiff,* | |
| | **COMPLAINT** |
| v. | |
| | |
| UNITED STATES OF AMERICA, | |
| | |
| *Defendant.* | |

Plaintiff Maria Farmer brings this action against the United States of America [United States] and alleges for her complaint as follows:

## PRELIMINARY STATEMENT

1.  For nearly a quarter of a century, Jeffrey Epstein, the infamous sex trafficker and abuser of minors and young women, along with his co-conspirators, was able to engage in a wide-ranging sex trafficking venture because the Federal Bureau of Investigation [FBI], United States Department of Justice [DOJ], and United States Attorneys' Offices [USAO] failed to listen to or protect his sex-trafficked, sexually abused, and sexually exploited victims.

2.  In 1996, Plaintiff Maria Farmer reported to the FBI that she had been sexually assaulted by Epstein and Ghislaine Maxwell, his long-time partner and leading co-conspirator.[1]

---

[1] In 2021, Maxwell was convicted by a jury in the Southern District of New York of multiple counts, including conspiracy to entice minors to travel to engage in illegal sexual acts, conspiracy to transport minors with intent to engage in criminal sexual activity, and

3.      What's more, Maria warned the FBI that Epstein and others had committed multiple serious sex crimes, including hands-on sexual abuse and trafficking, against girls and vulnerable young women, including against one of her minor sisters.

4.      Maria also alerted the FBI that Epstein had stolen nude and partially nude images of her two minor sisters and had transported those images across state lines.

5.      Maria also notified the FBI that Epstein and others were engaging in the possession, production, and distribution of sexually lascivious or exploitative images of children that could well constitute child pornography, another sex crime against children.[2]

6.      Despite the seriousness of Maria's allegations, the likelihood that criminal conduct was continuing, the requirements of federal regulation and mandatory express policy to investigate or conduct a serious preliminary inquiry regarding such allegations and, if indicated, refer such allegations to local investigators and prosecutors, the statutory designation of the FBI as a mandatory reporter of child sex abuse and exploitation, and the federal prioritization of investigation of child pornography and child sex abuse crimes, the FBI, in violation of its mandatory obligations under regulations and DOJ policies, chose to do absolutely nothing.

7.      In fact, an FBI agent taking Maria's call hung up on her, and no one at the FBI attempted to follow up with her or pursue her valid and serious allegations, most of which continued for many years, if not decades, with wide-ranging tragic consequences.

---

transportation of a minor with intent to engage in criminal sexual activity.
https://apnews.com/article/ghislaine-maxwell-guilty-what-next-5082bd54ec442632c53319e6c43c2dd4..
[2] Child pornography, a legal term in the United States Code, implies consent which a child cannot provide for this kind of activity.

8.      As a result, Epstein and others working with him were able to threaten bodily harm to Maria and her family for decades, forcing her to relocate many times and even change her name.

9.      In the meantime, Epstein exponentially multiplied his sexual abuse, exploitation, and trafficking of girls and young women.

10.      The United States government failed to pursue Epstein for decades. From 2005 to mid-2008, the United States Attorney's Office for the Southern District of Florida [USAO-SDFL], faced with mounting evidence of Epstein's child sex abuse, sex trafficking, and child pornography crimes, failed to comply with federal regulations and the USAO Manual's explicit mandate to promptly notify the DOJ Civil Rights Division of all sex trafficking investigations, to coordinate such investigations with the Civil Rights Division, to defer staffing decisions on such investigations to the Civil Rights Division, and to keep the Civil Rights Division informed. The USAO-SDFL also failed to promptly notify the DOJ Child Exploitation and Obscenity Section, violating another specific USAO Manual's requirement.

11.      Federal authorities also ignored reports that Epstein paid victims to keep them quiet and threatened to break their legs or kill them if they notified or cooperated with law enforcement.

12.      In addition, in violation of various federal laws, federal law enforcement denigrated victims, calling them "child prostitutes," and failed to provide notices of criminal processes or offer them victim services or protection.

13.      Instead, the USAO-SDFL gave Epstein a sweetheart "deal-of-a-lifetime" non-prosecution agreement [NPA], even though the USAO Manual only authorized such agreements for cooperating witnesses, which Epstein was not.

14.    The USAO-SDFL also granted blanket immunity to Epstein and all his known and unknown co-conspirators from all federal crimes, contrary to federal statute and the USAO Manual requirement of cooperation and prohibition against transactional immunity.

15.    Then, after allowing Epstein to enter into a sweeping NPA—which violated numerous established policies, practices, and procedures—federal authorities failed to enforce even the agreement's minimal terms, allowing Epstein (i) to plead guilty to soliciting one minor when the agreement required him to plead guilty to soliciting multiple minors; (ii) to flout the sex offender registration requirement; (iii) to obtain work release for 12 hours each day when the agreement required, or was supposed to require, Epstein to be imprisoned for 24 hours each day; and (iv) to serve his prison term in the "cushy" minimum-security Palm Beach County Jail when Epstein was supposed to be incarcerated in Palm Beach County Sheriff's Main Detention Center along with most other inmates.

16.    Moreover, federal law enforcement kept the NPA secret.

17.    It misled victims, sending them letters falsely claiming that the FBI was continuing to investigate Epstein's crimes in violation of the Crime Victims Rights Act of 2004.[3]

18.    This allowed Epstein to continue to sex traffic and sexually exploit girls and young women for years.

19.    Had the USAO-SDFL followed applicable non-discretionary mandates requiring coordination if not deference to specifically designated and experienced personnel experienced with child sex trafficking and child pornography and sought uniform application of federal law and policy, the USAO-SDFL and FBI would not have been able to minimize, disregard, and cover up Epstein's crimes as they repeatedly did for decades.

---

[3] 18 U.S.C. § 3771.

20.    Initially, in an effort to get to the bottom of what happened without engaging in litigation, Maria filed a FOIA request with the FBI, seeking, at a minimum, documents reflecting any communications between the FBI and Maria in 1996 and 2006. When this request was rejected, Maria tried again. On or about January 2, 2025, the FBI advised that her FOIA request was on the "complex request small processing track" with an "estimated date of completion" of "November, 2027."

21.    Meanwhile, by letter dated May 2, 2023, Maria through counsel urged the United States to investigate its conduct regarding Maria's report to the FBI and law enforcement's handling of Epstein. By letter dated May 11, 2023, the Inspector General acknowledged that Maria's allegations were "concerning," "thank[ed] [counsel] for giving us the opportunity to review your client's concerns," but said that they were busy at that time with other matters. Then, some eighteen months after her May 2, 2023 letter, DOJ, by letter dated December 2, 2024, stated, "[A]though an internal affairs investigation was not initiated, IAS mandated action be [sic] taken to address the concerns raised in your complaint." DOJ then unilaterally decreed that "IAS/IPU [Internal Affairs Section/Initial Processing Unit] considers your complaint addressed."

22.    The DOJ, FBI, and USAO failed to treat Maria's and other victims' allegations with the seriousness and urgency that the victim complaints and government policies required, failing to curtail or even mitigate Epstein's long-running ongoing threat. To date, federal authorities have refused or ignored Maria's request(s) to commence an investigation of these serious unresolved allegations. They have also flatly denied Maria's efforts to address the issues outside of litigation. In so doing, Defendant left Maria with no choice but to commence this lawsuit.

23.     Had the United States paid attention to Maria in 1996 and 2006 and to innumerable other victims over the years and complied with their mandatory duties rather than succumb to the dictates of a well-connected billionaire sex trafficker and his high-powered legal team, Epstein's sex trafficking, sexual abuse, and child pornography crimes could have been stopped soon after they began, and countless young women and girls would have been spared more than a quarter of a century of unchecked sexual abuse and exploitation.

**<u>JURISDICTION & VENUE</u>**

24.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

25.     This action arises under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 2671-2680. This Court is vested with jurisdiction pursuant to 28 U.S.C. § 1346(b). Jurisdiction is appropriate in this Court because a federal question is presented under the Federal Tort Claims Act.

26.     If the United States were a private individual, based on the facts alleged herein, it would be liable to Maria under applicable state law.

27.     On November 10, 2022, July 20, 2023, and October 26, 2023, as required by 28 C.F.R. 14.2, Maria Farmer submitted a Standard Form 95 alerting the FBI and DOJ of a potential claim.

28.     At no time did the FBI or any other government entity reach out to Maria to investigate or seek to understand or resolve her claims or otherwise in any way substantively respond to her claim.

29.     All conditions precedent to Maria's filing this action have been satisfied. Specifically, Maria served proper notice on Defendant, and more than six months elapsed with no resolution from Defendant.

30.     This Court also has supplemental jurisdiction of any state law claim pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein are part of a uniform pattern and practice and form part of the same case or controversy.

31.     Venue is proper in the United States District Court for the District of Columbia pursuant to 28 USC § 1391(b)(1) because the Defendant resides in this District, and there are several connections between the Defendant and the District, such as the in-District apparent knowledge of Maria's 1996 complaint, location of the Civil Rights Division, and location of the Child Exploitation and Obscenity Section.

32.     This action is timely filed pursuant to the FTCA and the discovery rule. To date, information regarding Defendant's culpability—the predicate for Plaintiff's timely claims against Defendant—has only partially been revealed to the public. Such revelations occurred only after years of Defendant's willful concealment, obfuscation, and refusal to investigate their own misconduct. Plaintiff became aware of the nature and extent of Defendant's negligence, her injuries, and the cause of these injuries after the case against J.P. Morgan Chase & Co. was litigated, recent congressional reports and documents were made public, and publication of other recent media announcements and discoveries.

## PARTIES

33.     Maria is a United States citizen residing in the United States.

34.     The United States of America is the Defendant in this action pursuant to the FTCA. The Defendant's liability arises from the acts and/or omissions of employees and agents of the FBI and the DOJ, which are both agencies of the Defendant, along with other agencies.

35.     Defendant controlled, funded, managed, operated, and/or owned the relevant federal agencies at all relevant times.

36.     Defendant funded the applicable federal agencies which were statutorily required to act within their mandate and authority at all relevant times.

37.     It was the Defendant's and appropriate agencies' duty to follow up and investigate reports of sex crimes against children and others, sex trafficking claims, and child pornography reports, and to prevent such crimes from occurring and reoccurring.

38.     The FBI and USAO are federal law enforcement agencies empowered and required by federal law to enforce and investigate certain alleged United States Criminal Code violations. The FBI and USAO are subject to oversight and direction by the Attorney General, an executive employee of the Defendant.

39.     Agents, servants, and employees of the relevant federal agencies are agents, servants, and employees of the United States.

## FACTS

### A.   The Statutory and Regulatory Framework in 1996 Regarding the Investigation of Child Sex Abuse and Exploitation

40.     As detailed below, at all relevant times, the FBI had a non-discretionary obligation, governed by established laws, policies, procedures, rules, and protocols, to investigate and address reports concerning sexual abuse, child pornography, sex with minors, and sex trafficking, to investigate those who were alleged to have committed such crimes, and to take reasonable steps to prevent them from continuing to commit those crimes and to protect those victimized by such perpetrators.

1. **The FBI's Mission to Investigate Crimes and Protect Victims of Violent Crimes**

41.    The FBI was established to maintain law and public order in the United States. Its mission is to "protect the American people and uphold the Constitution of the United States"[4] and maintain its motto of "Fidelity–Bravery–Integrity."[5] The FBI encourages people to report crimes.[6] According to the FBI, all tips of suspected criminal activity "must all be taken seriously and thoroughly evaluated."[7]

42.    Federal regulation requires the FBI to investigate law violations involving the Defendant:

> The Director of the Federal Bureau of Investigation shall:
>
> Investigate violations of the laws…of the United States and collect evidence in cases in which the United States is or may be a party in interest….

28 C.F.R. 0.85. Federal laws in which the United States may be a party in interest include the interstate transportation of obscene matter and the sexual exploitation of children. (*e.g.*, 18 U.S.C. §§ 1462, 2251, 2252). Consistent with this requirement, the FBI's Manual for Investigative Operations and Guidelines (1991) ("MIOG"), applicable in 1996, charged the FBI with "Investigative Responsibilities," including investigating violations and collecting evidence regarding such violations of federal law.

> The FBI is charged with the duty of investigating violations of the laws of the United States and collecting evidence in cases in which the United States is or may be a party in interest….

---

[4] FBI, Frequently Asked Questions, https://www.fbi.gov/about/faqs/what-is-the-mission-of-the-fbi.

[5] FBI, Seal & Motto: History and Heraldry of the Seal, https://www.fbi.gov/history/seal-motto.

[6] FBI, Contact Us, https://www.fbi.gov/contact-us.

[7] U.S. Dep't of Justice: Federal Bureau of Investigation, Making Prevention A Reality: Identifying, Assessing, and Managing the Threat of Targeted Attacks (February 2017), https://www.fbi.gov/file-repository/making-prevention-a-reality.pdf, p. 15.

MIOG 1–2(1), pp. 1–2. *See also* MIOG 145-3 (expressly granting investigatory authority as to sexual exploitation of children and non-mail transportation of child pornography to the FBI).

43.     "Investigations are conducted when information is received indicating a violation of Federal law, over which we have been given investigative jurisdiction, has or may have occurred." MIOG 1-2(3).

44.     "The function of a Special Agent of the FBI is to conduct thorough investigation of cases in a legal and ethical manner and to carry each of those cases through to a logical conclusion." MIOG 1–2(3), p. 1–2.

45.     The "Attorney General's Guidelines on General Crimes," included in the MIOG, established the FBI as the "primary criminal investigative agency of the federal government" that "plays a central role in national law enforcement and in the proper administration of justice in the United States." MIOG 1–3, p. 1–3.

46.     "Investigations by the FBI are premised upon the important duty of government to protect the public against general crimes…or who would destroy our constitutional system through criminal violence." MIOG 1–3, p. 1–3.

47.     "All investigations of crime or crime-related activities shall be undertaken in accordance with one or more of these Guidelines." MIOG 1–3, p. 1–3.

48.     The FBI must conduct preliminary inquiries and investigations to prevent, detect and prosecute federal law violations – "Preliminary inquiries and investigations governed by these Guidelines are conducted for the purpose of preventing, detecting, or prosecuting violations of federal law." MIOG I, p. 1-4.

49.     The FBI was authorized to initiate investigations in advance of criminal conduct when "statements advocate criminal activity or indicate an apparent intent to engage in crime, particularly crimes of violence…." MIOG I, p. 1–5.

50.     Investigations were to be terminated after "all logical leads have been exhausted and no legitimate law enforcement interest justifies their continuance." MIOG I, p. 1–5.

51.     The FBI may also conduct a "preliminary inquiry" which must be recorded in writing. "The FBI supervisor authorizing an inquiry shall assure that the allegation or other information which warranted the inquiry has been recorded in writing." MIOG I, p. 1–6.

### 2. The FBI's Requirement to Investigate Obscene Matter Cases and Recognition that Such Cases Often Involve Child Sex Abuse

52.     The 1991 MIOG set forth federal statutes prohibiting the transportation and distribution of obscene matter and sexual exploitation. 28 U.S.C. § 1462 et seq. MIOG Part 1 § 145–1.7 to 1.14. Per the 1991 MIOG, most obscene matter cases required the interview of the abuser.

> During the course of the investigation of most obscene matter cases, it becomes necessary to interview the subject and obtain obscene evidence from him/her.

MIOG Part I § 145–2(9). The obscene evidence was obtainable by a search warrant, interview with the person, and other means. *Id*.

53.     The MIOG acknowledged that persons who collect child pornography know it is illegal, and many engage in child sex abuse.

> Investigations have shown that many individuals who import or consensually exchange child pornography for their own collections do so repeatedly and with full knowledge that it is illegal to do so. In addition, many of these individuals regularly engage in sexual child abuse.

MIOG Part I § 145–4.7(3). FBI field offices were encouraged to coordinate such investigations with local law enforcement and others. MIOG Part I § 145–4.7(4).

### 3. The United States' Prioritization of Reporting, Investigation, and Prosecution of Sex Crimes Against Children

54.    Per the 1991 MIOG, the FBI prioritized the investigation of sex crimes against children.

55.    The DOJ has advised the USAO that prosecution priority should be given to matters involving violations of Title 18, U.S.C., Sections 2251–2257 [sex crimes against children]. FBI Priority should continue to be given to any investigative matters involving such use of children. MIOG Part I § 145-4.8(1).

56.    Moreover, "If there are any indications that child abuse is present, the FBI should ensure that the matter is called to the attention of local investigators and prosecutors." MIOG Part I § 145-4.8(2).

57.    The FBI gave "special priority" to "cases involving the…interstate…shipment of material depicting minors engaging in sexually explicit conduct." MIOG Part I § 145-4.8(5).

58.    The FBI also focused on "rings" distributing obscene matter, noting that the FBI was "greatly desirous of curtailing the interstate operations of these combines."  MIOG Part I § 145-4.1(4).[8]

59.    The FBI's self-avowed priority for the protection of children was further demonstrated in the establishment of the Innocent Images National Initiative (IINI) in May 1995, which focused on those who exploited children through the use of computers and established the Innocent Images Project, a multi-agency task force and national project to combat the use of computers to traffic in child pornography.[9]

---

[8] Publicly available copies of the 1991 MIOG contain substantial deletions of portions of the Manual, suggesting that an additional portion of the Manual may be relevant to this case.
[9] The 1996 Annual Report of The Attorney General of the United States (https://www.justice.gov/archive/ag/annualreports/ar96/96agannl.pdf, p. 7). Starting in 1993, the

60.    The DOJ and USAO similarly prioritized the investigation and prosecution of child sex abuse and exploitation crimes. According to the 1996 Annual Report of the Attorney General of the United States (1996 DOJ Report), DOJ supported child pornography legislation, instituted the IINI, "waged an aggressive battle to protect children from individuals who use…computers to sexually abuse and exploit them," and helped to pass amendments to the child pornography laws criminalizing the dissemination, receipt, or possession of child pornography.[10]

### 4. The FBI's Mandatory Reporting Obligation to Report Child Sex Abuse and Exploitation to Law Enforcement as Per Statute and Guidelines

61.    Starting in 1990, Congress enacted various laws applicable to the FBI and other federal agencies to address ever-increasing child abuse and neglect, including child sex abuse and exploitation.

62.    These statutory changes were based on Congressional findings that child abuse was widespread, with nearly 3.5 million reports of suspected child abuse and neglect every year. The investigation and prosecution of these cases were "extremely complex, involving numerous agencies and dozens of personnel," and "too often," the system did "not pay sufficient attention to the needs and welfare of the child victim, aggravating the trauma" suffered by the child victim. 42 U.S.C. § 13001 (subsequently 34 U.S.C. § 20301).

63.    Congress also determined that "multidisciplinary child abuse investigation and prosecution" was critical to "increase the reporting of child abuse cases, reduce the trauma to the

---

FBI increasingly investigated child exploitation, resulting in the January 1997 establishment of the Crimes Against Children Unit. https://oig.justice.gov/reports/FBI/a0908/index.htm.

[10] "During 1996, the Department continued its aggressive attack on the serious problem of violence against women in America." *See* https://www.justice.gov/archive/ag/annualreports/ar96/96agannl.pdf, pp. 5, 7, 14, 33. The 1996 DOJ Report also boasted that DOJ had "[s]uccessfully prosecuted cases under the Violence Against Women Act," which was enacted to protect women against sexual assault, date rape, and domestic violence.

child victim, improve positive outcomes for the child, and increase the successful prosecution of child abuse offenders." *Id.*

64.    These provisions imposed mandatory reporting obligations on FBI personnel to report any suspected claim of child sex abuse to law enforcement.

65.    In particular, under 34 U.S.C. § 20341(a)(1) (and its predecessor provision, 42 U.S.C. § 13031(a), applicable at the time of Maria's complaint), entitled "Child abuse reporting," a person "while engaged in a professional capacity…on Federal land or in a federally operated (or contracted) facility," who "learns of facts that give reason to suspect that a child has suffered an incident of child abuse," including sexual abuse or exploitation, "shall as soon as possible make a report of the suspected abuse" to the appropriate law enforcement agency.

66.    Section 20341(a)(2) provides that any "covered individual," including law enforcement personnel, "who learns of facts that give reason to suspect that a child has suffered an incident of child abuse, including sexual abuse, shall as soon as possible make a report of the suspected abuse to the agency designated by the Attorney General under subsection (d)."

67.    "Child abuse" includes "sexual abuse or exploitation," and "child exploitation" includes "child pornography and child prostitution." 34 U.S.C. § 20341(c)(1) and (6).

68.    Section 20341(d) further provides that all reports received shall be promptly investigated.

69.    According to a May 29, 2012 DOJ Office of Legal Counsel opinion, this statute applies to incidents that federal law enforcement officers discover during the course of their

duties on federal land or in a federal facility even if the child abuse itself did not occur on federal land or in a federal facility.[1112]

70.    The FBI Manual repeated and expanded the FBI's obligation to report any indications of child abuse to law enforcement. "If there are any indications that child abuse is present, the FBI should ensure that the matter is called to the attention of local investigators and prosecutors."[13] MIOG Part I §145–4.8(2).

71.    Reporting child sex abuse and exploitation by official personnel was also required in New York, starting in 1973 pursuant to N.Y. Soc. Serv. L. § 413. New York law required reporting of child abuse "immediately" by telephone or facsimile, followed up by a written report within 48 hours. N.Y. Soc. Serv. Law § 415. Officials required to report suspected child abuse are civilly liable for the damages caused by such failure. N.Y. Soc. Serv. L. § 420.

### 5.    FBI Requirements to Notify Victims Regarding Criminal Investigations and the Availability of Victim Services, Including Protection from Intimidation and Harassment

72.    Under the Victims' Rights and Restitution Act (VRRA), 34 U.S.C. § 20141, crime victims were entitled to receive information as to the status of the criminal investigation, to be informed of the place where they may receive medical and social services, to be informed of public and private programs available for counseling and other support services, and to receive

---

[11] Duty to Report Suspected Child Abuse Under 42 USC § 13031, Department of Justice Office of Legal Counsel (May 29, 2012), available at https://www.justice.gov/sites/default/files/olc/opinions/2012/05/31/aag-reporting-abuse.pdf.

[12] Subsequent FBI policy explicitly provides that mandatory reporting is in addition to and not to replace other reporting requirements with which FBI personnel must also comply. All FBI personnel must comply. The report must be made "immediate[ly]." FBI policy also requires employees to document the information as soon as practicable—no more than five business days from receipt—and to retain such documentation.

[13] Effective Dec. 10, 1991.

reasonable protection from a suspected offender and persons acting in concert with or at the behest of the suspect offender.

73.    Further, under the Crime Victims' Rights Act (CVRA) of 2004 (18 U.S.C. § 3771), crime victims are accorded certain rights such as the right to be reasonably protected from the accused, to accurate and timely notice of any public court proceeding, to be treated with fairness and with respect for the victim's dignity and privacy, to be timely informed of any plea bargain or deferred prosecution agreement, and to be informed of the rights and services under the VRRA.

74.    The FBI and federal prosecutors were supposedly trained regarding their statutory victim-witness responsibilities.[14]

75.    The 1995 Attorney General Guidelines set forth various services for victims and witnesses during the federal criminal justice process, including information, referral, and protection from intimidation and harassment.[15]

## B.    The Federal Government's Early Awareness of Epstein

76.    Epstein was known by or tied to federal authorities for decades, often in connection with suspicious and illegal activities.

77.    In 1981, Epstein reportedly abruptly left Bear Stearns after committing a possible Regulation D violation with rumors that he had engaged in other illegal activities.[16]

78.    Epstein subsequently was a business partner with Steven Hoffenberg at Towers Financial, who was prosecuted and imprisoned for bilking investors out of over $450 million in a

---

[14] See, e.g., Chapter 3 - 1996 Report to Congress.
[15] See also 1995 Attorney General Guidelines
https://ovc.ojp.gov/sites/g/files/xyckuh226/files/pubs/OVC_Archives/nvaa2002/chapter3_2.html.
[16] Vicky Ward, The Talented Mr. Epstein, VANITY FAIR (March 2023),
https://archive.vanityfair.com/article/2003/3/the-talented-mr-epstein.

Ponzi scheme that was then the largest financial fraud in American history. Even though Epstein was not charged, other parties have alleged that Epstein received illicit funds and was one of Hoffenberg's co-conspirators. *See Gerber v. Financial Trust Co.*, Civ. No.1:18-cv-07580 (S.D.N.Y. August 20, 2018); *United States v. Hoffenberg*, No. 94. CR. 213 RWS, 1997 WL 96563 (S.D.N.Y. Mar. 5, 1997).

79.     In 1991, James W. Schacht, acting Director of Insurance of the State of Illinois, acting as Conservator/Liquidator of United Diversified Corporation ("UDC") and related companies, sued Hoffenberg, alleging an insurance Ponzi fraud. Although Epstein and his company were recipients of improper fund disbursements, Epstein was not charged. *See United States v. Hoffenberg*, No. 94 Cr. 213 (RWS), 95 Cr. 321 (RWS), 1997 WL 96563 (S.D.N.Y. March 5, 1997); PlainSite :: Hoffenberg v. Epstein et al, New York Southern District Court Case No. 1:16-cv-03989-RJS Document 1: Complaint

80.     In 1992, instead of assisting in the investigation or prosecution of Epstein, the United States Department of State rented a luxurious New York City townhouse to him. When, in 1996, Epstein, in violation of the lease, marketed the property to real estate brokers and sublet the townhouse at a profit, the United States Department of State sued Epstein and others. In defending the suit, Epstein relied on communications with Richard Massy of the Office of Foreign Missions in Washington, D.C. Certain documents were sealed in the case, and the only consequences to Epstein appear to be a termination of the lease.[17]

---

[17] *See U.S. v. Epstein,* 27 F. Supp.2d 404 (S.D.N.Y. 1998); Rosie Gray, The State Department Once Rented A Townhouse Seized From Iran To Jeffrey Epstein — Then Sued Him For Subletting It, BUZZFEED NEWS (July 14, 2019), https://www.buzzfeednews.com/article/rosiegray/jeffrey-epstein-state-department.

**C. Maria's Introduction to Epstein and Maxwell and Increasing Exposure to Their Activities**

81.    In the mid-1990s, Maria, then in her mid-twenties, was a burgeoning artist, having recently graduated from the New York Academy of Art with a Master of Fine Art degree.

82.    With the encouragement and insistence of Peggy Guggenheim, then head of the New York Academy of Art, Maria met Epstein and sold him one of her paintings for half the amount she had already been offered for the piece.

83.    At the trial of Ghislaine Maxwell, Epstein's partner and procurement "lieutenant," evidence was presented that Epstein repeatedly promoted himself to young artists and actresses as a philanthropist interested in helping them achieve their educational and professional dreams. Epstein used the same modus operandi with Maria, promising her assistance with her budding career in visual arts.

84.    Epstein and Maxwell bragged to Maria that they were connected to important, wealthy, influential people who assisted, supported, and protected them in their endeavors.

85.    Epstein hired Maria initially as an "art scout" for his collection. The position expanded to receptionist, clerk, and other duties in Epstein's New York City mansion, an apartment building on East 66th Street where Epstein housed many young girls, along with his office.

86.    Over several months in 1996, Maria witnessed many young women going in and out of Epstein's New York mansion, including children in school uniforms. She also witnessed Maxwell actively "scouting" for new teenage girls whom Epstein was purportedly also "helping."

87.     Maria occasionally ran errands with Maxwell using Epstein's car. During these "errands," Maxwell repeatedly directed the driver to stop the car so that she could "go get girls" for Epstein.

88.     Maria also helped with interior design at the 66th Street apartment building, where she observed many young women coming and going, many of whom appeared to be teenagers.

89.     Epstein informed Maria about the video cameras recording activities at the New York City mansion. He showed her a media room filled with such recording devices and monitoring systems. Epstein noted his sophisticated computer equipment, which was in continuous use.

90.     Epstein and Maxwell also bragged about a "modeling book" that was so valuable, important, and private that they kept it locked in Epstein's safe. This "modeling book," which they shared with others occasionally, contained images of what appeared to be children explicitly posed in various stages of undress.

91.     Maxwell claimed that the "modeling book" was used in connection with Victoria's Secret, one of retail magnate Les Wexner's businesses, and another wealthy and influential Epstein friend.

92.     Maria also saw binders with images of nude teens and young women at Epstein's Palm Beach mansion.

93.     Epstein's homes were filled with photographs and other sexualized artwork featuring nude females, some of whom appeared to be minors, including partially naked images.

94.     At first, Maria accepted Epstein and Maxwell's innocuous business interests or "eccentric" justifications for these activities.

**D. Epstein and Maxwell Sexually Assault Maria, Steal Her Sisters' Nude Photographs, and Threaten Her with Violence**

95.    In the summer of 1996, Epstein encouraged Maria to leave New York City, where she lived, and become a summer "artist-in-residence" at his home in New Albany, Ohio. That residence was part of or adjacent to Les Wexner's estate.

96.    Epstein and Maxwell directed Maria to give them keys to her New York City apartment while she was out of town.

97.    In or about late July or early August 1996, during a visit to the Ohio property, Epstein and Maxwell sexually assaulted Maria. Maria was stunned and devastated.

98.    Maria also discovered that, during their visit, Epstein and Maxwell had stolen images that Maria maintained and cataloged by number in her personal, private collection for her personal use in her artwork, including nude images of two minor siblings.

99.    Epstein and Maxwell, for their and perhaps others' sexual gratification, transported these images via airplane from Ohio to New York.

100.    Maria increasingly realized that Epstein and perhaps others produced, compiled, and collected sexualized images of minors, whether in their "modeling book," Epstein's safe, or through images stolen from Maria and likely others.

101.    In transporting the images back to New York with him, Epstein trafficked sexually explicit images of at least two children across state lines from Ohio to New York.

102.    Maria also became frightened that Epstein, who had falsely presented himself to Maria's sister and their mother as a well-intentioned "benefactor," assaulted one of her minor sisters as well as other children.

103.    Increasingly anxious and distressed, Maria attempted to leave Epstein's New Albany residence to return to her home in New York, retrieve the images, protect her sisters, and

report Epstein's and Maxwell's wrongdoing. However, for many days, Maria was physically threatened by a local Sheriff and other persons connected with Wexner and prevented from leaving the New Albany property.

104.    To silence her, Epstein repeatedly called Maria in Ohio, attempting to trivialize the sexual assault, the images he admitted to taking, and other misdeeds.

105.    Epstein told Maria that he would "make it up to her," offered to provide her with "compensation," and asked her what she "wanted."

106.    When Maria did not cooperate with Epstein's attempts to pay her off, she continued to be held in Ohio against her will and threatened.

107.    Only after Maria contacted family members and took other actions was she "permitted" to leave the property.

108.    When Maria returned to New York, she discovered that her apartment had been painted black and most of her furniture removed. Since Epstein and Maxwell were the only persons with access to her apartment, it was clear that they had trashed and burgled her home.

109.    Maria confronted Epstein and Maxwell, demanding, among other things, that they return the stolen photographs of her sisters. They refused, ridiculed her, and retaliated against her, threatening to physically harm her and her family and to burn all her artwork.

110.    Epstein and Maxwell reminded Maria that they were connected to important and influential people. They warned her that "bad things would happen to her" if she did or said anything. Maxwell directed Maria to keep quiet and threatened to torch her artwork, the building where she was living, and all the people in it. Maxwell told Maria that she and Epstein could and would destroy her career. Maria believed that they had the power to do so and much more.

111.    Increasingly, Maria realized that Epstein's and Maxwell's sexual abuse and threats to her, the parade of girls and young women in his home, their destruction and theft of her property, the grooming of one of her minor sisters, and their purloining, interstate transportation, and retention of her minor siblings' sexually explicit images were part of a far-ranging criminal enterprise.

**E.   Maria's August 1996 FBI Report about Epstein's Child Sex Abuse, Sex Trafficking, and Child Pornography Crimes**

112.    Maria did what she thought every American should do when they become crime victims, suspect children are sex crime victims and believe there is ongoing serious criminal activity. On August 29, 1996, she reported Epstein and Maxwell to law enforcement.

113.    Initially, Maria reported Epstein's crimes to the New York Police Department's Sixth Precinct ("NYPD").

114.    Maria disclosed to the NYPD that Epstein and Maxwell had sexually abused her and that Epstein and Maxwell, together with others, were committing multiple ongoing illegal sex abuse crimes, including crimes against minors and vulnerable young women, child pornography crimes, and possible crimes against her minor siblings.

115.    According to NYPD Police Report Complaint #1996-0067241, dated 8/29/96, "[Maria] states…[Epstein] did call her and stated he was going to burn victim's painting and send her polaroids of the burnt paintings. [Epstein] has keys to victim's apartment."

116.    The NYPD explained that they could only address the local fire threats and that she needed to report her additional allegations to the FBI. They gave her the FBI's telephone contact information which she believes had an area code as part of the phone number.

117.    Following the NYPD's instructions and believing that federal law enforcement would help her, Maria promptly contacted the FBI, making at least two calls to two different offices.[18]

118.    Maria told the FBI what happened, including Epstein's and Maxwell's sexual abuse of her and her concern that they likely had also abused one of her minor sisters, who she often took care of and assumed care-taking responsibilities for, and other young women; their possession, production, distribution, and transportation of child pornography—including the stolen images of Maria's young sisters—their operation of a child trafficking ring; and her belief that they were continuing to hurt children.

119.    Maria specifically told the FBI about the explicit images of children she observed at Epstein's home and that Epstein and Maxwell kept a binder of what appeared to be child pornography in a safe.

120.    Maria also notified the FBI that Epstein had recording devices and sophisticated computer monitoring equipment throughout his New York City mansion which presumably recorded sexual and other activities there.

121.    Without notice or explanation, while Maria was in mid-sentence, the FBI abruptly hung up on her.

122.    The FBI made no effort to meet with Maria or otherwise follow up.

123.    Upon information and belief, the FBI failed to comply with 28 C.F.R. § 0.85 and the MIOG regarding Maria's report. In particular, the FBI failed to conduct a thorough

---

[18] Prior to 2003, phone calls within New York City did not require using an area code. *See* https://www.nytimes.com/2003/01/21/nyregion/11-digit-local-dialing-starts-in-new-york-city-on-feb-1.html. Thus, it appears that Maria may well have contacted the FBI in Washington, DC rather than just a local NY field office.

investigation of federal law violations concerning the interstate transportation of obscene matters and the sexual exploitation of children, failed to carry those matters to a logical conclusion, and failed to exhaust all logical leads to ensure that no legitimate law enforcement interest justified their involvement. The FBI also failed to conduct a proper preliminary inquiry to prevent, detect, and prosecute multiple federal law violations.

124. Maria's allegations of Epstein's child sex abuse, sexual exploitation, and child pornography could have been corroborated with minimal investigatory effort. As established at Maxwell's federal trial, Epstein maintained a bevy of minors and young women in New York, Florida, and wherever else he went in his private jet. Given Epstein's strongly suspected widespread deployment of recording devices and the well-established use of child pornography by sexual abusers to normalize sexual conduct and groom victims, there was a significant likelihood of multiple serious ongoing child pornography crimes centered on Epstein and his cohorts.[19] Indeed, recently, Attorney General Pam Bondi confirmed the FBI's possession of vast numbers of child porn videos from Epstein.[20]

125. Maria confirmed her report to the FBI in a 1997 entry in her personal journal:

---

[19] *See, e.g.*, Understanding Grooming, Coalition for Children, https://safechild.org/understanding-grooming/. *See also* OPR Report p. 176.

[20] According to Attorney General Bondi, "There are tens of thousands of videos of Epstein with children or child porn and there are hundreds of victims." 'Tens of thousands': Bondi says FBI reviewing Epstein videos | Miami Herald



126.     The FBI confirmed Maria's 1996 report in field notes of a 2006 meeting with her. Those notes reveal that Maria had previously reported Epstein to the NYPD Sixth Precinct, who advised her to contact the FBI:[21]



### F.     The United States Government's Expansion of Focus on Protecting Children from Crimes

127.     In January 1997, the FBI established the Office of Crimes Against Children as a division within the Criminal Investigative Division (CID) to address the victimization of children and issues on interagency liaison, legislative concerns, budget, and training.[22]

128.     FBI policies required FBI field offices to maintain regular contact with the Violent Crimes Against Children Unit (VCACU) personnel and request assistance and guidance

---

[21] https://vault.fbi.gov/jeffrey-epstein/Jeffrey%20Epstein%20Part%2018/view, Part 18, p. 24.

[22] https://oig.justice.gov/reports/FBI/a0908/app4.htm

whenever there was suspected child abuse; when necessary, to contact field office victim

specialists for matters related to the Victim Assistance Program; and, along with VCACU, to

cooperate with state and local law enforcement agencies, nongovernmental organizations, and

social service agencies to protect children.

129.    VCACU and FBI field offices were required "to develop working relationships

with relevant outside agencies," including "federal, state, and local agencies charged with

enforcing laws pertinent to combating crimes against children threats." An investigative

partnership was encouraged for such investigations:

> Investigative partners serve as a force multiplier for investigative matters that have federal,
> state, and local jurisdiction by coordinating investigations with [field offices], participating
> in task forces, and assisting in prosecutions. This partnership allows for multiple venues to
> prosecute these cases, and circumstances of each case will dictate the resources brought to
> bear by partner agencies.[23]

130.    In May 1997, the FBI began requiring each of its 56 field offices to appoint at

least two Special Agents to serve as Crimes Against Children Coordinators (CAC Coordinator).

As the primary "go-to" persons within each FBI field office, the CAC Coordinators were

responsible for liaising with local law enforcement and social service agencies to help coordinate

crimes against children investigations in their jurisdiction.[24]

131.    In keeping with this ongoing federal law enforcement priority, along with

significant resources devoted to child pornography and sex abuse crimes, the 2005 USAO

Manual established "General Prosecution Policies and Priorities" strongly encouraging the

---

[23] Office of the Inspector General, Investigation and Review of the Federal Bureau of
Investigation's Handling of Allegations of Sexual Abuse by Former USA Gymnastics Physician
Lawrence Gerard Nassar 21-093 (July 2021) p. 15 (available at
https://oig.justice.gov/sites/default/files/reports/21-093.pdf).
[24] Office of the Inspector General, The Federal Bureau of Investigation's Efforts to Combat
Crimes Against Children, Audit Report 09-08 (January 2009) (available at
https://oig.justice.gov/reports/FBI/a0908/chapter1.htm).

"[p]rosecution of all crimes involving the sexual abuse or sexual exploitation of children and the distribution of child pornography…." The USAO Manual repeated the 1991 MIOG recognition that persons who collect child pornography often engage in child sex abuse and use child pornography to normalize their criminal activities.

132.    Research has shown that many individuals who produce, distribute, or collect child pornography do so repeatedly with full knowledge of its illegality. In addition, many of these individuals engage in child sexual abuse or would like to if given the right opportunity. Many of these people also intentionally engage in occupations or activities that bring them into frequent contact with children. Finally, many people use child pornography to encourage their child victims to engage in sexual activity. USAO Manual, Section 9-75.020.

## G.  The FBI's Failure to Comply with their Mandatory Reporting Obligation and Other Failures

133.    Upon information and belief, contrary to federal and state law and policy, which considered the FBI a mandatory reporter (e.g., New York Social Services Law § 413), no one from the FBI reported Maria's 1996 complaint to the New York State Police, state or local law enforcement, or child welfare officials allowing Epstein's unchecked abuse of children and young women to continue unabated for decades.

134.    Further, the FBI failed to follow up with Maria, inform her of her rights as a crime victim under the VRRA, undertake a multi-disciplinary child abuse investigation or prosecution, or try to reduce Maria's trauma or the endless trauma of countless child victims.[25]

---

[25] Maria repeatedly urged the FBI and other agencies to investigate her allegations, publicly asserted her allegations, and filed FOIA requests to obtain FBI documents. Still, the FBI provided no information other than to say that the most recent request was currently in the "complex request small processing track" with an "estimated date of completion" of "November 2027."

135.    Upon information and belief, the FBI failed to contact Ohio authorities to investigate Maria's report.

136.    Given the utmost seriousness and urgency of Maria's allegations regarding child sex abuse and exploitation and law enforcement's need to prioritize such investigations, the FBI failed to notify the appropriate authorities of the allegations, adequately respond to the allegations, or take other steps to mitigate the ongoing serious threat posed by Epstein.

137.    In violation of the MIOG, the FBI failed to "conduct thorough investigations…in a legal and ethical manner…through to a logical conclusion" or to terminate their investigation when "all logical leads have been exhausted and no legitimate law enforcement interest justifies their continuance." MIOG 1-3, p. 1-3; 1-2(3), pp. 1-2; 1-5.

138.    There was no lawful or legitimate reason to fail to report to law enforcement or investigate a child sex abuse and exploitation complaint.

139.    The FBI's outrageous and cavalier disregard for Maria's 1996 report (and her subsequent report ten years later) about Epstein's crimes constituted a fundamental violation of applicable law as well as a dereliction of the FBI's mission, principles, statutory obligations, and operations manual.

**H.  Epstein and Maxwell Terrorize Maria after Federal Law Enforcement Does Nothing**

140.    With nothing and no one to deter them, Epstein and Maxell continued their reign of terror over Maria and her family.

141.    Terrified and alone, and well aware that the institutions that should have protected her had failed, Maria fled New York City and then the New York region to escape Epstein's and Maxwell's ongoing abuse and threats.

142.    In the following years, Maria relocated repeatedly, sometimes even using a different name.

143.    Somehow, Epstein and Maxwell always found her, cautioning her that they knew her location while continuing to harass and frighten her.

144.    Epstein and Maxwell warned Maria that she could never truly escape them, no matter how often she relocated or sought to hide.

145.    Epstein and Maxwell threatened Maria that if she ever "opened her mouth" about what she had seen and experienced, they would find out and hurt her and her sisters.

146.    In or about 2003, journalist Vicky Ward of Vanity Fair interviewed Maria about Epstein. Before the story was published, however, Epstein became aware of it and had Maria's statements removed. Soon after, he escalated threats against Maria.

147.    Epstein and Maxwell continued to harass, bully, and menace Maria.

148.    As a result of Epstein's and Maxwell's misconduct and the FBI's failures, Maria's health and well-being deteriorated and spiraled downward.

## I.    The Federal Government Gives Epstein Special Treatment by Ignoring his Suspicious Banking Transactions, Failing to Conduct Proper Background Checks, and Issuing Numerous Travel Documents without Question

149.    Starting in or about 2002, J.P. Morgan Chase Bank ("Chase Bank") reported Epstein's suspicious financial transactions to the United States Treasury on at least six occasions.

150.    Chase Bank submitted multiple Cash Transaction Reports and other materials concerning Epstein. *Government of the Virgin Islands v. JP Morgan Chase Bank, N.A.*, Case 1:22-cv-10904-JSR, Doc.#238-14, JP Morgan Response to Request for Admission No. 40 (S.D.N.Y. July 25, 2023).

151.    It has been alleged that Chase Bank handled $9 million in transfers to girls and women, many with Eastern European names, and suspicious cash withdrawals from Epstein accounts. According to one report, dividing the $9 million by a couple of hundred dollars—the

typical amount Epstein was known to pay victims and recruiters—resulted in over "20,000 unlawful sex acts facilitated by JPMorgan."[26]

152.    Upon information and belief, Defendant failed to respond to Chase Bank's reports and took no action.

153.    In 2002, the United States Secret Service, then part of the Department of the Treasury tasked with protecting the nation's leaders and safeguarding the country's infrastructure, cleared presidential travel on Epstein's private jet for Bill Clinton.

154.    Thus, at or about the same time the Treasury Department received reports from Chase Bank about Epstein's suspicious banking transactions, the Treasury Department presumably did a deep background check on Epstein.

155.    That same year, Epstein was the subject of substantial media attention. For example, on October 28, 2002, New York Magazine published an expose entitled "Jeffrey Epstein: International Moneyman of Mystery." Epstein was described as having "cash to burn, a fleet of airplanes and a keen eye for the ladies" with a "life full of question marks…run[ning] $1.5 billion for wealthy clients" with a "closely held secret" client list."[27]

156.    Upon information and belief, in November 2002 and on other occasions, Defendant issued visas and at least one passport to young women to travel with Epstein on his private jet.

---

[26] Chloe Atkins, JPMorgan Allegedly Notified The Government Of $1 Billion In Suspicious Transactions by Epstein, NBC NEWS (Sept. 11, 2023), https://www.nbcnews.com/news/us-news/jpmorgan-allegedly-notified-government-1-billion-suspicious-transactio-rcna104535.
[27] Landon Thomas Jr., Jeffrey Epstein: International Moneyman of Mystery, NY MAGAZINE (October 28, 2002), https://nymag.com/nymetro/news/people/n_7912/.

157.    In addition, Epstein repeatedly requested new or multiple passports, sometimes using different addresses.[28] These activities presumably also required background checks. It was later determined that Epstein maintained an Austrian passport under a different name with an address in Saudi Arabia.

158.    Although Epstein repeatedly failed to report his international flights on his private jet, the United States Department of State did nothing to investigate or attempt to revoke his passports until in or about 2019.[29]

159.    Belatedly, after Epstein died in 2019, Chase Bank notified the Treasury Department of more than $1 billion in transactions related to Epstein's "human trafficking" dating back 16 years—transactions that could and should have been reviewed by the Treasury Department and bank regulators.[30]

160.    Further, during the Chase Bank litigation, the Epstein estate revealed that the executors may have discovered child pornography on Epstein's private island. Yet it remains unclear whether the FBI—or any law enforcement authority—ever reviewed or investigated those materials.[31]

161.    Defendant similarly ignored Epstein's "significant compliance" errors in his later banking relationship with Deutsche Bank.[32]

---

[28] https://midutahradio.com/news/national-news/records-show-jeffrey-epsteins-requests-for-multiple-passports-travels-to-africa-and-middle-east/

[29] *Id*.

[30] https://www.cnbc.com/2023/09/01/report-jpmorgan-flagged-over-1b-in-epstein-transactions-to-treasury.html.

[31] Andrea Blanco, Two Women Tried To Expose Jeffrey Epstein Three Decades Ago. Why Didn't The FBI Stop Him?, THE INDEPENDENT (Jan. 28. 2024), https://www.independent.co.uk/news/world/americas/farmer-sisters-epstein-fbi-abuse-b2479602.html.

[32] https://www.cnn.com/2020/07/07/business/jeffrey-epstein-deutsche-bank-fine/index.html.

**J.  The Palm Beach Police Department's Investigation into Epstein Starting in Approximately 2005, Including the Discovery of Likely Child Pornography**

162.  Meanwhile, in March 2005, a fourteen-year-old girl and her parents reported Epstein to the Palm Beach Police Department (the "PBPD") for sexual assault and solicitation.[33]

163.  Approximately a dozen girls told the PBPD that they were raped or molested by Epstein at his Palm Beach mansion.

164.  The girls told strikingly similar stories of what occurred and accurately described details regarding Epstein's Palm Beach home.

165.  Upon investigating, the PBPD discovered phone message books filled with girls' names,[34] a high school transcript, references to a child's availability as only "after school," and sex toys and objects.

166.  The PBPD also encountered "several photographs of young naked teenage girls…" in Epstein's home.[35]

167.  When Epstein's home was searched, computer equipment was missing, with wires left dangling as if the hard disks and servers had been hurriedly removed.

168.  Ultimately, a Florida grand jury heard testimony about Epstein's sexual abuse of a fourteen and a sixteen-year-old girl.

---

[33] Holly Baltz, Inside Jeffrey Epstein's Palm Beach Home: What The Victims Saw And Described To Police, THE PALM BEACH POST (November 5, 2021), https://www.palmbeachpost.com/story/news/crime/2021/11/05/video-inside-jeffrey-epsteins-palm-beach-home-what-victims-saw/6268316001/.

[34] Holly Baltz, Inside Jeffrey Epstein's Palm Beach Home: What The Victims Saw And Described To Police, THE PALM BEACH POST (November 5, 2021) https://www.palmbeachpost.com/story/news/crime/2021/11/05/video-inside-jeffrey-epsteins-palm-beach-home-what-victims-saw/6268316001/.

[35] Palm Beach Police Department, Incident Report (February 17, 2006).

169.    In 2006, frustrated by the Palm Beach State Attorney's Office's mismanagement of the case, the PBPD reported Epstein to the FBI.[36]

## K.  Substantial Evidence of Epstein's Sex Trafficking, Child Pornography, and Other Crimes

### 1.  Information Obtained by the FBI as to Child Sex Abuse and Sex Trafficking

170.    In their Florida investigation, the FBI learned that Epstein recruited underage girls aged fourteen to seventeen to travel to his homes in Palm Beach and New Mexico, where he would sexually assault them.[37]

171.    At least one survivor, who was 14 years old, told the FBI that she had been photographed nude.[38]

172.    Epstein paid for attorneys to represent some of the victims.[39]

173.    Upon information and belief, some of the victims reported to law enforcement that they were threatened and warned "You're going to die" or "I'm going to break your legs." Victims were also offered compensation for refusing to cooperate with authorities. The FBI did little or nothing to protect or assist these victims.

174.    The FBI investigation identified approximately 30 victims, including approximately 20 victims ages 14 to 17, who Epstein had sexually assaulted.

175.    Victims also informed the FBI that Epstein trafficked them to other locations.[40]

---

[36] Frances Robles et al., *Examining Acosta's Claims on the Epstein Prosecution*, N.Y. TIMES (July 10, 2019), https://www.nytimes.com/2019/07/10/us/politics/acosta-epstein-fact-check.html ("Local law enforcement officials and the F.B.I. referred the case to Mr. Acosta, in part because they feared Mr. Epstein would face no more than a single state charge related to prostitution, which warranted a fine and no jail time."); FBI, Jeffrey Epstein File, Part 1 of 22, https://vault.fbi.gov/jeffrey-epstein/Jeffrey%20Epstein%20Part%2001%20of%2022.
[37] *Doe 1*, 359 F. Supp. 3d at 1205.
[38] OPR Report, pp. iv, 176.
[39] *Id.*
[40] https://dailycaller.com/2020/11/13/jeffrey-epstein-acosta-victims-attorney-fbi/

### 2. Maria's Second Report to the FBI about Child Sex Trafficking, Child Pornography, and Other Crimes

176.    In 2006, as part of their "investigation," FBI agents arrived unannounced at Maria's home in North Carolina. The agents advised Maria that they knew that she had previously complained to the FBI about Epstein, indicating that FBI headquarters was aware of or may have been involved with her prior report. The agents met with Maria for several hours.

177.    The FBI agents specifically acknowledged Maria's 1996 report to the FBI about Epstein, affirming their awareness of Maria's earlier FBI complaint.

178.    The FBI agents told Maria that they needed her testimony for an investigation of Epstein in Florida.

179.    Maria was very reluctant to speak with the agents, particularly after the FBI had previously failed her, leaving her vulnerable and exposed to Epstein's threats. However, the FBI agents pressed her to help them, representing that they would "get him" this time.

180.    With those representations from the FBI, Maria again told the FBI that Epstein and Maxwell had sexually assaulted her, that they appeared to be engaged in widespread sexual abuse and trafficking of young women and children, that they were operating a pedophile ring, and that Maxwell would frequently "go get girls" for Epstein's sexual desires.

181.    Maria again told the FBI about her concerns that Epstein had sexually assaulted one of her minor sisters.

182.    Maria again told the FBI about Epstein's theft and transport across state lines of nude and partially nude photographs of her two minor siblings.

183.    Maria again told the FBI about Epstein's child pornography-filled "modeling book," which was kept in a locked safe at his New York City mansion.

184.    Maria again told the FBI about Epstein's extensive video recording devices and sophisticated computer system at his home in New York City.

185.    Maria again told the FBI that Epstein, Maxwell, and others had seriously and continuously threatened her and her sisters.

186.    The FBI failed again to offer Maria, as a crime victim, any victim services or provide notifications required by the VRRA and CVRA.

### 3. The Government's Utter Failure to Obtain Additional Evidence of Epstein's Apparent Production, Distribution, and Possession of Child Pornography

187.    Defendant received substantial evidence of Epstein's production, distribution, transportation, and possession of child pornography, some depicting his victims.

188.    Maria told the FBI that Epstein had boasted about the recording and computer devices in his home and had shown her the equipment.

189.    Maria reported that Epstein had stolen nude images of her minor sister and transported them across state lines.

190.    In addition, when police executed a search warrant of Epstein's Florida home in 2005, they found dangling wires attached to monitors without any computers or hard drives.[41]

191.    Files and images on this missing computer equipment could have identified other victims and countered any argument that Epstein was unaware that the girls were minors.[42]

192.    Due to reports by Maria and others, Defendant was well aware of Epstein's use of video recording devices and computers in connection with the ongoing sexual exploitation in his

---

[41] OPR Report, pp. 175-79. *See also* Jacob Shamsian, FBI Agents Used A Saw To Open A Safe In Jeffrey Epstein's Manhattan Mansion That Held Hard Drives And Diamonds, BUSINESS INSIDER (Dec. 6, 2021), https://www.insider.com/fbi-used-saw-open-jeffrey-epstein-safe-hard-drives-diamonds-2021-12.

[42] OPR Report, p. 176.

home(s). According to a lengthy report prepared by the Department of Justice's Office of Professional Responsibility ("OPR") entitled "Investigation into the U.S. Attorney's Office for the Southern District of Florida's Resolution of Its 2006–2008 Federal Criminal Investigation of Jeffrey Epstein and Its Interactions with Victims During the Investigation" (November 2020) (the "OPR Report"), the FBI knew and had reason to believe that "Epstein used hidden cameras in his New York residence to record his sexual encounters, and one [minor] victim told agents that Epstein's assistant photographed her in the nude."[43]

193.    "[I]nvestigators had learned that Epstein used hidden cameras in his New York residence to record his sexual encounters, and [the AUSA] believed he could have engaged in similar conduct in his Palm Beach home."[44]

194.    The 2005 USAO Manual established "General Prosecution Policies and Priorities" strongly encouraging the "[p]rosecution of all crimes involving the sexual abuse or sexual exploitation of children and the distribution of child pornography…." Much like the 1991 MIOG, the Manual stated:

> Investigation has shown that many individuals who produce, import or consensually exchange child pornography do so repeatedly and with full knowledge that it is illegal to do so. In addition, many of these individuals engage in child sexual abuse or would like to do so, given the right opportunity. Many of these people also intentionally engage in occupations or activities that bring them into frequent contact with children. Finally, many people use child pornography to encourage their child victims to engage in sexual activity.

USAO Manual, Section 9-75.020.

195.    Even Defendant's own OPR Report acknowledged that Epstein's "computers might have contained child pornography…."[45]

---

[43] OPR Report, p. 176.
[44] OPR Report, p. 46.
[45] *Id*. at 176.

196.    Epstein's attorneys refused to turn over the hard drives, and Defendant made no serious effort to compel them to do so.[46]

197.    The USAO failed to take definitive action to compel the turnover of Epstein's hard drives.[47]

198.    Instead, as the OPR Report determined, the U.S. Attorney "resolved the federal investigation before significant investigative steps were completed," and the investigation ended "prematurely."[48]

199.    Moreover, the OPR Report noted that with his "multistate lifestyle[,] it was reasonable to assume that [there was possible] interstate transmission of child pornography…that could have changed the entire complexion of the case against Epstein."[49]

200.    The USAO, like the FBI, ignored child pornography and the other serious allegations by Maria and other victims and, in so doing, failed to stop or mitigate the ongoing threat posed by Epstein.

**L.    The USAO Failed to Involve or Coordinate with the Civil Rights Division in Their Epstein Sex Trafficking Investigation in Blatant Violation of Federal Regulation and the USAO Manual**

201.    Federal regulations mandate that "all Federal statutes affecting civil rights," including criminal prosecutions," be administered by the Civil Rights Division of the U.S. Attorney General's office:

---

[46] OPR Report, pp. iv, 45-47, 60-61, 70, 175-79. *See also* Jacob Shamsian, FBI Agents Used A Saw To Open A Safe In Jeffrey Epstein's Manhattan Mansion That Held Hard Drives And Diamonds, BUSINESS INSIDER (Dec. 6, 2021), https://www.insider.com/fbi-used-saw-open-jeffrey-epstein-safe-hard-drives-diamonds-2021-12.

[47] *See* OPR Report, pp. iv, 45-47, 60-61, 70.

[48] *Id*. at p. 170.

[49] *Id*. at p. 176.

The following functions are assigned to and shall be handled or supervised by the Assistant Attorney General, Civil Rights Division:

(a) Enforcement of all Federal statutes affecting civil rights…and authorization of litigation in such enforcement, including criminal prosecutions…

28 C.F.R. § 0.50. Under this regulation, the Civil Rights Division, based in Washington, D.C., was assigned to handle and supervise "[c]oordination within the Department of Justice of all matters affecting civil rights." 28 C.F.R. § 0.50(d). This regulation assigned the Civil Rights Division authority regarding "[r]esearch on civil rights matters, and the making of recommendations to the Attorney General as to proposed" civil rights policies and legislation. 28 C.F.R. §§ 0.50(e), (f).

202.    In compliance with this federal regulation, the USAO Manual noted, "The Assistant Attorney General of the Civil Rights Division…is responsible for conducting, handling, or supervising civil rights matters, as more particularly described in 28 C.F.R. § 0.50." USAO Manual § 8-1.010. The USAO Manual noted the "sensitive nature of the constitutional and statutory issues involved" and the "desirability of uniform application of federal law in this field," acknowledging the "prime importance" of "close consultation between the United States Attorneys and the Division on civil rights matters…." USAO Manual § 8-1.010.

203.    In particular, the USAO Manual mandated that certain federal statutes protecting civil rights be administered by the Civil Rights Division, including 18 U.S.C. 1591 regarding sex trafficking:

The following is a list of federal statutes and executive orders administered by the Civil Rights Division…18 U.S.C. § 1581 to 1594….

USAO Manual 8-1.100.

204.    USAO Manual § 8-3.000, entitled "Enforcement of Civil Rights Criminal Statutes," set forth detailed procedures for the USAO to follow in criminal sex trafficking and other civil rights cases.

205.    Section 8-3.100 mandated "Coordination of Activities," requiring partnership between the Civil Rights Division and the USAO on such cases – "[T]he Civil Rights Division and the U.S. Attorney's Office (USAO) will work as partners to ensure a vigorous national civil rights enforcement program."

206.    Section 8-3.100 noted the "purpose" of the Manual chapter was "to provide guidance to the United States Attorneys and the Criminal Section of the Civil Rights Division in carrying out their responsibilities in the investigation and prosecution of violations of criminal civil rights statutes in a manner that … utilizes the trial expertise and institutional knowledge of the Criminal Section of the Civil Rights Division." *Id.*

207.    The Manual noted, "Cooperative prosecutions and investigations utilizing attorneys from both the Criminal Section and the USAOs can be particularly successful and can provide valuable benefits in the enforcement of these statutes." *Id.*

208.    In addition, USAO Manual § 8-3.100 required the USAO to notify the Civil Rights Division of all sex trafficking matters. Thus, if either the Civil Rights Division or a USAO acted independently in such a case, "the office initiating the activity should ensure that the other office is notified in advance of the activity. Specifically…USAOs shall advise the Civil Rights Division of matters not already being monitored by the Civil Rights Division which appear likely to result in inquiries to the Civil Rights Division." *Id.*

209.    Similarly, USAO Manual § 8-3.110 required the FBI to promptly call or fax any "initiating FBI investigative request to the Chief of the Criminal Section of the Civil Rights Division."

210.    USAO Manual § 8-3.120 required the USAO to promptly notify, in writing, the Civil Rights Division, "at the outset" of all sex trafficking and other human trafficking investigations:

> At the outset of a criminal investigation initiated by a USAO that may implicate federal criminal civil rights statutes, including human trafficking and involuntary servitude statutes (18 U.S.C. §§ 1581–1594) … the United States Attorney shall advise the Civil Rights Division in writing of the new investigation.

USAO Manual § 8-3.120. *See also* USAO Manual § 8-3.200 ("Civil Rights Division to be advised in writing."); USAO Manual § 8-3.120 (Although the USAO may investigate and prosecute any criminal civil rights violation, the USAO may do so "[s]ubject to the general principles contained herein….").

211.    USAO Manual § 8-3.120 further required that, as to child sex trafficking cases, the USAO must also notify the Child Exploitation and Obscenity Section of the Criminal Division.

> In cases involving sex trafficking of minors in violation of 18 U.S.C. § 1591, the Child Exploitation and Obscenity Section of the Criminal Division should also receive notification.

*See also* USAO Manual § 8-3.200.

212.    USAO Manual § 8-3.120 set forth specific procedures to follow for such notification by letter or electronic mail identifying the targets of the investigation, the factual allegations to be investigated, the statutes which may have been violated, the U.S. Attorney's assessment of the significance of the case, whether the case was of "national interest," and the U.S. Attorney's proposed staffing of the matter.

213.    Moreover, the USAO was to keep the Civil Rights Division apprised of new

information in the case:

> The United States Attorney will advise the Civil Rights Division as the case develops of
> new information relating to the United States Attorney's assessment of the case and
> whether it is one of "national interest."

USAO Manual § 8-3.120.

214.    Although, as per USAO Manual § 8-3.120, the Civil Rights Division gave

deference to staffing proposals by the USAO, the Civil Rights Division maintained ultimate

authority over staffing sex trafficking cases:

> The Assistant Attorney General of the Civil Rights Division retains the final and ongoing
> authority to determine the staffing of any criminal civil rights matter.

USAO Manual § 8.3.120.

215.    The USAO Manual entrusted the Assistant Attorney General for Civil Rights, not

the USAO, with the "ultimate authority to determine whether a case is of "national interest."

USAO Manual § 8-3.130. Moreover, where there is a case of "national interest," the Attorney

General may mandate that the Civil Rights Division serve as co-counsel starting with the

commencement of the investigation through prosecution. USAO Manual § 8-3.130 ("In a case of

'national interest,' the Assistant Attorney General, in consultation with the United States

Attorney, may require that the USAO and the Civil Rights Division participate jointly as co-

counsel from the initiation of the investigation through prosecution, taking into consideration all

of the circumstances, including the experience of the particular USAO….").

216.    Presumably, under USAO § 8-1.010, these detailed requirements were designed to

ensure that experienced and sufficient personnel were involved, sufficient and appropriate

attention and oversight was provided, individual federal law enforcement officers did not skew

decision-making or manifest poor judgment, and sloppy or corrupt practices by a single USAO were not determinative.

217.    In this case, in flat contradiction to federal regulation and USAO Manual § 8-3.120, the USAO failed to promptly notify the Civil Rights Division of the Epstein sex trafficking investigation.

218.    Indeed, it was not until February 28, 2008—nearly six months after Epstein and the USAO signed the NPA and some *two years* after the USAO knew about Epstein's sexual abuse and trafficking of minor children and young women—that the USAO notified the Civil Rights Division about the Epstein investigation.

219.    Moreover, even when the USAO finally provided its late notice to the Civil Rights Division, the USAO designed the notice to cover up their notification failure, unilaterally declaring that the matter was merely "child prostitution" and not a matter of "national interest."[50]

220.    At no time was proper notice provided by the USAO to the Civil Rights Division regarding the Epstein sex trafficking investigation as required by USAO Manual § 8-3.120.

221.    At no time was the Civil Rights Division accorded the right to control the investigation's staffing as required by USAO Manual § 8-3.120.

222.    At no time was the Civil Rights Division informed of computer evidence that could be obtained against Epstein regarding possible child pornography crimes.

223.    Despite the sensitive nature of the investigation and issues, at no time was the USAO informed by the guidance of the Civil Rights Division, the trial expertise and institutional knowledge of the Civil Rights Division, or the need for uniform application of federal law in this case.

---

[50] OPR Report p. 103 fn. 162.

224.    It appears that the USAO did not inform the Civil Rights Division of the lengthy case history or that an NPA had already been executed. Nor did the USAO otherwise comply with other notice requirements in USAO Manual 8-3.120.

225.    Without discovery, it is unknown whether or not the FBI delivered any initiating request to the Chief of the Criminal Section of the Civil Rights Division as required by the USAO Manual 8-3.110.

226.    The Defendant utterly failed to competently follow federal law requirements concerning the investigation and prosecution of Epstein's sex trafficking crimes.

227.    These failures are particularly jarring if not bizarre since U.S. Attorney for the Southern District of Florida, Alexander Acosta served as Assistant Attorney General to the Civil Rights Division until mid-2005, immediately before becoming U.S. Attorney and heading that Epstein investigation.

### M.  The USAO's *Failure to Timely Notify CEOS in Violation of the USAO Manual*

228.    USAO Manual § 9-74.030 requires that the "USAOs shall inform CEOS [Child Exploitation and Obscenity Section] of all significant investigations and cases being prosecuted in the district" concerning child abuse, child pornography, and obscenity crimes. As with the Civil Rights Division notice requirement, this ensured that personnel experienced with child pornography and child abuse crimes were involved in preparing such cases.

229.    At all relevant times, the CEOS was based in Washington, D.C.

230.    In 2003, the FBI launched with CEOS and NCMEC the Innocence Lost Project to combat domestic sex trafficking of children.[51]

---

[51] https://oig.justice.gov/reports/FBI/a0908/final.pdf, p. xxiii.

231.    Upon information and belief, despite this Manual requirement and the FBI's focus on domestic child sex trafficking, the USAO did not involve CEOS in their Epstein investigation until more than a year after the USAO was notified about the matter, long after a cursory investigation was completed, the USAO had prepared a prosecution memorandum, and the USAO was already considering if not moving forward with resolving the matter without charging Epstein.[52]

**N.  The USAO's Failure to Comply with the Manual's Express Requirements Concerning an NPA and the Extraordinary Grant to Epstein of Transactional Immunity from Federal Prosecution**

232.    USAO Manual § 9-27.600 authorizes government attorneys to enter into an NPA in exchange for a person's cooperation which "appears to be necessary to the public interest and other means of obtaining the desired cooperation are unavailable or would not be effective." *See also* Criminal Resources § 719 ("[T]the government and a cooperating defendant or witness might enter into…a non-prosecution agreement if the defendant or witness agrees to cooperate.").

233.    The USAO Manual Sections 9-27.620 and 9-27.630 provide guidelines for prosecutors on entering into an NPA.

234.    USAO Manual Section 9-27.640 prohibits a government attorney from entering into an NPA in exchange for a person's cooperation without first obtaining the approval of the appropriate Assistant Attorney General, or his or her designee, when the person is someone who "is likely to become of major public interest."

---

[52] OPR Report pp. 27-28.

235.    The USAO completely failed to obtain or take any significant steps to seek Epstein's cooperation in violation of USAO Manual §§ 9-27.600-640, which requires witness cooperation in exchange for an NPA.

236.    Instead, in 2008, Defendant granted Epstein the "deal of a lifetime"—an extraordinary secret NPA—allowing Epstein to plead to two minor state-law crimes while "immunizing" his co-conspirators."[53]

237.    Moreover, throughout the investigation, Epstein continued to engage in the sexual abuse and trafficking of young women, moving his primary operations to the Virgin Islands and elsewhere and even sexually assaulting at least one young woman in Florida.[54]

238.    Epstein continued his sex trafficking operation with impunity right under the nose of the FBI and USAO.

**O.    The USAO's Failure to Comply with USAO Manual Requirements Regarding Witness Immunity**

239.    18 U.S.C. § 6001 et seq. authorizes the USAO to grant limited immunity in exchange for witness testimony in limited circumstances. Under section 6001 et seq., the USAO Manual Section 9-23.000 allows the USAO to apply for an order granting a witness limited "use" immunity when a witness invokes their self-incrimination privilege. As to witness immunity, "[T]he Department of Justice utilizes only those provisions contained in Title 18" regarding witness testimony.

240.    Immunity requests "shall" be forwarded to the Witness Immunity Unit, and approvals from specified Attorney General officials were necessary for such immunity. Criminal Justice Manual 720.

---

[53] *Id*. at iii.
[54] *See* OPR Report, p. 44.

241.    Nothing in the statutory scheme, USAO Manual, or USAO policy authorized a grant of immunity without witness cooperation, a written immunity request, or needed approvals.

242.    However, without meeting with Epstein's co-conspirators, obtaining any approvals, or utilizing limited use immunity, the USAO agreed in the NPA that the United States "will not institute any criminal charges against any potential co-conspirators of Epstein," thereby granting all of Epstein's co-conspirators—named and unnamed, known and unknown—full transactional immunity.

**P.    The USAO's Failure to Comply with the VRRA, CVRA, USAO Manual and Attorney General Guidelines Regarding Victim's Rights**

243.    The USAO Manual confirms the statutory obligations to protect child victims of sex abuse. After noting the "alarming increase in reports of child abuse cases…each year," the insufficient attention paid to child victims, and the concomitant aggravation of child trauma, the USAO Manual acknowledges the "primary goal of every Justice Department law enforcement officer, investigator, prosecutor, victim/witness professional and staff member shall be to reduce the trauma to child victims and child witnesses caused by the criminal justice system." USAO Manual § 9-75.610.

244.    In addition, USAO Manual § 9-75.610 mandates the provision of service referrals to every child victim. To protect child victims and witnesses, "Justice Department personnel are required to provide child victims with referrals for services and should provide child witnesses with services referrals." USAO Manual § 3-7.300 establishes additional instructions and procedures regarding victim and witness assistance, including training and implementation of victims' rights services.

245.    The Attorney General Guidelines (2005) also established various rights for all victims, including the "right to be reasonably protected from the accused" and the "right to be treated with fairness and with respect for the victim's dignity and privacy."

246.    Contrary to the USAO Manual's express goal to reduce trauma to child victims and witnesses and the Attorney General's confirmation of the right to be treated with fairness and dignity, federal law enforcement referred to the victims throughout the investigation as "prostitutes" instead of victims of child sexual abuse, and to the charges against Epstein as "procur[ing] prostitution" of a minor, not child sexual abuse.

247.    Similarly, under the Attorney General Guidelines for Victim and Witness Assistance, responsibilities to crime victims begin "at the earliest opportunity after the detection of a crime," with investigative agencies providing "reasonable protection" to victims."[55]

248.    The 2005 Attorney General Guidelines for Victim and Witness Assistance required employees to "minimize the frustration and confusion that victims of crime endure in its wake."[56]

249.    The 2005 Attorney General Guidelines also imposed "mandatory training" on all employees with primary responsibilities, including crime victim contact.[57]

250.    Upon information and belief, even though Maria had informed the FBI that Epstein and Maxwell threatened her, and other victims reported that Epstein was threatening them with loss of life and limb, at no time did the Defendant offer Maria or any other victim protection from Epstein and his co-conspirators. Nor did they offer service referrals or other information as required by the USAO Manual, Attorney General Guidelines, VRRA, and CVRA.

---

[55] ag_guidelines.pdf, pp. 23, 25.
[56] ag_guidelines.pdf, p. 2.
[57] ag_guidelines.pdf, p. 17.

251.    Instead, the FBI delivered false and misleading communications to victims, promising them that the Justice Department would make its "best efforts" to protect their rights, including "the reasonable right to confer with the attorney for the United States in the case" and "to be reasonably heard at any public proceeding in the district court involving [a]...plea." The victim notices further stated at a time when the investigation was complete or nearly complete: "At this time, your case is under investigation."[58]

**Q.  The USAO's Failure to Enforce the NPA's Terms or Purpose**

252.    The basis of Epstein's NPA was the USAO's agreement to defer his prosecution in exchange for his compliance with the Agreement. NPA pp. 1-2, attached in OPR Report Exhibit 3.

> [T]these offenses shall be deferred in favor of prosecution by the State of Florida, provided that Epstein abides by the following conditions and the requirements of this Agreement set forth below….

NPA p. 2.

253.    Per the NPA, this deferral would cease if Epstein violated any of the NPA's terms—the federal grand jury investigation and subpoenas would be revived, and the United States could terminate the agreement, investigate, and prosecute him:

> [U]pon execution of this agreement and a plea agreement with the State Attorney's Office, the federal Grand Jury investigation will be suspended, and all pending federal Grand Jury subpoenas will be held in abeyance unless and until the defendant violates any term of this agreement. ***

> Epstein asserts and certifies that each of these terms is material to this agreement … that a breach of any one of these conditions allows the United States to elect to terminate the agreement and to investigate and prosecute Epstein and any other individual or entity for any and all federal offenses

---

[58] OPR Report, pp. 197, 212, 214, 222.

NPA pp. 5, 6.

254.    Epstein violated at least four key and material terms of the NPA, but the United

States failed to terminate the NPA or take any other action.

255.    First, the NPA required Epstein to plead guilty to solicitation of prostitution of

multiple "minors."

> Epstein shall plead guilty to…the solicitation of minor**s** to engage in prostitution, in
> violation of Florida Statutes Section 796.03….

NPA p. 3.

256.    However, Epstein pleaded guilty to solicitation of only one minor.[59]

257.    In so doing, rather than Epstein pleading guilty to a pattern of abuse of multiple

minors, Epstein admitted only to procuring the "prostitution" in one isolated incident with one

16-year-old girl.

258.    Second, the NPA required Epstein to register as a sex offender:

> Epstein shall plead guilty to an Information filed by the State's Attorney's Office
> charging Epstein with an offense that requires him to register as a sex offender….

NPA p. 3.

259.    According to the OPR Report, the sex offender registration requirement was

critical to USAO's agreement to the NPA.[60]

260.    Epstein effectively avoided sex offender registration by declaring that he moved

from New York to the Virgin Islands, thereby escaping the 90-day appearance required of other

New York sex offenders.[61]

---

[59] OPR Report p. 111.
[60] OPR Report pp. 63, 78, 81-83.
[61] *See* Erin Donaghue, NYPD Says It Wasn't Required to Monitor Jeffrey Epstein's Sex Offender
Registration, CBS News (Jul. 11, 2019), https://www.cbsnews.com/news/jeffrey-epstein-nypd-
says-it-wasnt-required-to-monitor-sex-offender-registration/.

261.    Although the DOJ Office of Sex Offender Sentencing, Monitoring, Apprehending, Registering, and Tracking (SMART Office) in Washington, D.C. administers the standards for the sex offender registration and notification program established by the Adam Walsh Act, neither the DOJ nor the SMART Office ensured that Epstein registered as a sex offender as required by the NPA.

262.    Third, the NPA required Epstein to be imprisoned and serve jail time, which the federal prosecutors repeatedly stated was fundamental to the agreement. The "USAO had made clear that it expected Epstein to be incarcerated 24 hours a day," and Epstein's attorneys assured the USAO that jail time was a "material term of the agreement."

> Epstein shall be sentenced to consecutive terms of twelve (12) months and six (6) months in county jail for all charges, without any opportunity for withholding adjudication or sentencing, and without probation or community control in lieu of imprisonment….[62]

263.    However, unbeknownst to the USAO, Epstein's attorneys successfully applied for work release. Thus, Epstein converted 24-hour prison time into a 12-hour work-day release. Epstein's daily "work" included walks on the beach, an "office" presumably located inside his attorney's office, and visits to his private doctor's office.

264.    The limitation on Epstein's liberty was so lax that he even sexually abused women during his prison term. One victim reported that she "was coerced into performing sex acts with" Epstein and another woman during the time plainclothes members of the Palm Beach Sheriff's Office were providing "security" for Epstein.[63]

---

[62] OPR Report Exhibit 3.
[63] Matt Stieb, Lawsuits Allege Epstein Arranged for Sex with Teenager While on Work Release, N.Y. MAGAZINE (Aug. 20, 2019), https://nymag.com/intelligencer/2019/08/epstein-trafficked-teenager-while-on-work-release-lawsuit.html.

265.    Fourth, rather than serve his days in the Main Detention Center, where prisoners were usually kept, Epstein was housed in the low-security "cushy" Palm Beach County Stockade, separate from other inmates, with his cell door unlocked and his own private security detail.[64] He was often referred to as "Mr. Epstein" or the "client" and not, like other prisoners, "Inmate Epstein."[65]

266.    Although the NPA listed various possible crimes against Epstein, it said nothing about sex trafficking or child pornography. NPA pp. 1-2.

267.    Moreover, promptly after agreeing to the NPA, Epstein's attorneys spent nine months trying to change the terms of the agreement, seeking to invalidate the agreement by persuading senior DOJ officials in Washington, D.C. that there was no federal interest, seeking review by the Department's Criminal Division and Office of the Deputy Attorney General, and otherwise delaying or trying to avoid Epstein's plea and incarceration.[66]

268.    Contrary to the CVRA, the NPA was considered secret and not disclosed to the victims in a timely manner.[67]

269.    Instead, in January and May 2008—months after the NPA was signed—the FBI sent additional letters to victims falsely advising them, "This case is currently under

---

[64] OPR Report pp. 113-17.
[65] https://www.washingtonpost.com/investigations/captain-at-jail-where-epstein-served-time-in-2008-ordered-that-his-cell-door-be-left-unlocked/2019/07/19/93e38934-a972-11e9-86dd-d7f0e60391e9_story.html.
[66] OPR Report pp. ii, 11.
[67] *Id. See also In re: Investigation of Jeffrey Epstein*, Non Prosecution Agreement ("NPA") (dated Sept. 24, 2007), available at https://www.documentcloud.org/documents/6184602-Jeffrey-Epstein-nonprosecution-agreement.

investigation. This can be a lengthy process and we request your continued patience while we conduct a thorough investigation."[68]

270.    Despite these violations of the NPA, an FBI internal memorandum on September 18, 2008, reported that Epstein was "currently being prosecuted by the State of Florida and is complying with all conditions of his plea with the State of Florida."[69]

## R.    The Government's Acknowledgment of Their Poor Treatment of Maria and Others

271.    As the OPR Report explained, the USAO mistreated victims:

[T]he government's lack of transparency and its inconsistent messages led to victims feeling confused and ill-treated by the government; gave victims and the public the misimpression that the government had colluded with Epstein's counsel to keep the NPA secret from the victims; and undercut public confidence in the legitimacy of the resulting agreement. The overall result of the subjects' anomalous handling of this case understandably left many victims feeling ignored and frustrated and resulted in extensive public criticism. In sum, OPR concludes that the victims were not treated with the forthrightness and sensitivity expected by the Department.[70]

272.    Epstein and others continued their criminal enterprise for more than another decade.

273.    Contrary to the FBI's 2006 promises to Maria, the FBI did not "get" Epstein, leaving her (and many other victims), once again, abandoned, vulnerable, and afraid.

## S.    The Late, Lumbering Actions of Federal Authorities against Epstein and his Co-Conspirators

274.    It was not until approximately 2019 that the Defendant prosecuted first Epstein and then Maxwell.

---

[68] OPR Report p. 212.
[69] FBI Records: The Vault, Jeffrey Epstein Part 06 of 22, https://vault.fbi.gov/jeffrey-epstein/Jeffrey%20Epstein%20Part%2006%20of%2022/view.
[70] *See* OPR Report, pp. xi-xii; 286.

275.    Such further action against Epstein and his co-conspirators was taken only after lengthy federal civil litigation alleging that the NPA violated the Crime Victims Rights Act and a federal court determination that the failure to notify victims violated the Act;[71] after numerous journalists kept tirelessly reporting the story; and after numerous other private lawsuits and many efforts to bring the conspiracy to light.[72]

276.    During his decades-long criminal activity, Epstein was involved with many high-level government and business elites who accompanied him on multiple trips on the "Lolita Express" to the island of "Little St. Jeffs" and elsewhere, where he abused and trafficked girls and young women. Still, these individuals have not been the subject of law enforcement investigation.

277.    Indeed, the only person who has been held accountable for the Epstein sex trafficking conspiracy is Ghislaine Maxwell, a woman.[73]

278.    Federal law enforcement's repeated and continual failures, delays, and inaction allowed Epstein and others to continue their sex trafficking conspiracy for nearly a quarter of a century.[74]

**T.    A "Trove" of Sexually Explicit Images from Epstein's Safe Appears to Constitute Child Pornography**

279.    Maria's 1996 and 2006 reports regarding Epstein's and Maxwell's sexually explicit images proved to be accurate.

---

[71] *See e.g. Doe 1 v. United States*, 359 F. Supp. 3d 1201, 1204–05 (S.D. Fla. 2019).
[72] *See e.g. Jane Doe v. Epstein*, No. 09-80469-CIV-MARRA/JOHNSON, 2009 WL 2477304 (S.D. Fla. Aug. 11, 2009); *Giuffre v. Maxwell*, 165 F. Supp. 3d 147 (S.D.N.Y. 2016); *Jane Doe 1 v. Deutsche Bank et al.*, 22-cv-10018 (JSR), 2023 WL 4393130 (S.D.N.Y. Mar. 20, 2023).
[73] The government did prosecute Epstein's "houseman" for attempting to sell Epstein's contact information to an undercover government agent. (He received a sentence comparable to Epstein's for a much less serious crime.)
[74] *See* OPR Report, pp. 27 n.38, 33, 44.

280.    In 2019—just as Maria had reported to the FBI decades earlier—nude and sexually explicit images of young girls were, in fact, found locked in a safe in Epstein's New York mansion.

281.    According to the United States Attorney for the Southern District of New York prosecutors' memorandum seeking to deny Epstein bail, the 2019 search of Epstein's mansion unearthed a "'vast trove of lewd photographs' of young looking girls, including hundreds of meticulously labeled nude pictures locked in a safe.'"[75] "CDs in the safe had hand-written labels, including "'Young [Name] + [Name],' 'Misc nudes 1,' and 'Girl pics nude,'"[76]

282.    Despite the apparent plethora of evidence of Epstein's child pornography crimes, as well as the far-reaching conspiracy to traffic girls and young women, federal law enforcement stood by silently and for years took virtually no action.[77]

283.    Had law enforcement taken even minimal action to respond to Maria's reports and the reports of others, decades of crimes would have been avoided.

---

[75] Doug Stanglin, Inside Jeffrey Epstein's New York Mansion: 'Vast Trove' Of Lewd Photos, A Life-Size Doll And Other Oddities, USA TODAY (July 10, 2019), https://www.usatoday.com/story/news/nation/2019/07/10/jeffrey-epstein-inside-billionaires-new-york-mansion/1691137001/.

[76] Id.; Andrew Denney, Larry Celona, and Bruce Golding, Feds Found 'Vast Trove' Of Nude Photos In Jeffrey Epstein's Safe, NYPOST (July 8, 2019), https://nypost.com/2019/07/08/feds-found-vast-trove-of-nude-photos-in-jeffrey-epsteins-safe/; Josie Ensor and Jamie Johnson, Evidence From Jeffrey Epstein's Safe 'Went Missing' After FBI Raid, Court Hears In Ghislaine Maxwell Trial, The Telegraph (Dec. 7, 2021), https://www.telegraph.co.uk/world-news/2021/12/07/evidence-jeffrey-epsteins-safe-went-missing-fbi-raid-court-hears/; Photos of underage girls in Jeffrey Epstein's home entered as evidence in Ghislaine Maxwell trial, NBC News (Dec. 3, 2021), https://www.nbcnews.com/now/video/ghislaine-maxwell-trial-photos-of-underage-girls-in-jeffrey-epstein-s-home-entered-as-evidence-127862341515.

[77] OPR Report, pp. 11, 15, 147; see also Josh Gerstein, DOJ: Prosecutor erred by promising to confer with Jeffrey Epstein Victims, Politico (Dec. 3, 2020), https://www.politico.com/news/2020/12/03/doj-prosecutor-jeffrey-epstein-victims-442648; FBI Records: The VAULT, Jeffrey Epstein Part 17 of 22, https://vault.fbi.gov/jeffrey-epstein/Jeffrey%20Epstein%20Part%2017%20of%2022/view

284.    Without discovery in this case into the "vast trove of lewd photographs of young-looking girls," it may never be known whether some of these images include the pictures of Maria's sisters, which were stolen decades ago.[78]

285.    There has been no effort by Defendant to notify victims of the existence of their sexually explicit images, there has been no opportunity for such victims to seek restitution, and it is not known whether the images are in circulation, resulting in ongoing child pornography violations and unending victim exploitation.

*286.*    Despite readily available evidence and relative ease of prosecution, at no time did Defendant pursue a case against Epstein or others for child pornography crimes.

### U.    The OPR Report Whitewashing the USAO's Extensive Failures as to the Florida Investigation and Prosecution of Epstein

287.    In 2020, the Office of Professional Responsibility issued a 300-page report criticizing the USAO and accusing officials of "poor judgment" yet refusing to find professional misconduct.

288.    Under the heading, "ACOSTA EXERCISED POOR JUDGMENT BY RESOLVING THE FEDERAL INVESTIGATION THROUGH THE NPA," the OPR Report presented a detailed, multi-page critique of the USAO's handling of the Epstein prosecution, including Acosta's "flawed application of Petite policy principles," allowance of Epstein to "manipulate the conditions of his sentence to his own advantage," "premature decision to resolve the case [without] Epstein's missing computer equipment," and a "lack of coordination within

---

[78] Indeed, in recent years, the Epstein estate discovered new videos and photographs and voiced concern that they might contain child pornography. *See* stipulated motion dated March 27, 2023, in *Government of the United States Virgin Islands v. JPMorgan Chase Bank*, N.A., Case No. 1:22:cv-10904-JSR (S.D.N.Y.), Document 100.

the USAO…"[79] "[A]fter considering all of the available evidence and the totality of the then-existing circumstances, OPR concludes that Acosta exercised poor judgment in that he chose an action or course of action that was in marked contrast to that which the Department would reasonably expect of an attorney exercising good judgment."[80]

289.    Then-Senator Ben Sasse and many others refused to dismiss or white-wash the USAO's conduct as one of mere "poor judgment".

> Letting a well-connected billionaire get away with child rape and international sex trafficking isn't 'poor judgment' – it is a disgusting failure. Americans ought to be enraged. Jeffrey Epstein should be rotting behind bars today, but the Justice Department failed Epstein's victims at every turn. The DOJ's crooked deal with Epstein effectively shut down investigations into his child sex trafficking ring and protected his co-conspirators in other states. Justice has not been served.[81]

290.    Carefully restricting the analysis solely to the USAO's professional responsibility, which requires the government to meet a high bar of professional misconduct, the OPR Report ignored the USAO's negligence regarding Maria and other victims.

## V.  The Government's Refusal to Investigate its Negligence

291.    In a letter dated May 2, 2023, Maria contacted the FBI, U.S. Attorney, and Inspector General, detailing her claims and asking for an investigation of Defendant's failures, misdeeds, and negligence in this matter.

292.    In response, Defendant gave her cursory treatment, claiming they were too busy elsewhere and would someday get to it.

---

[79] OPR Report, pp. 169-70.
[80] OPR Report, p. 170.
[81] https://www.nationalreview.com/news/sasse-slams-doj-investigation-finding-no-misconduct-in-jeffrey-epstein-non-prosecution-deal/. *See also* https://www.nytimes.com/2020/11/12/us/politics/jeffrey-epstein-justice-department-miami.html

293.    In a letter dated May 11, 2023, the Office of the Inspector General advised Maria that, while the allegations raised were "concerning," they had other "priorit[ies] right now," so could not "further assess" Maria's allegations until later.

294.    In December 2023, the Senate Judiciary Committee questioned FBI Director Christopher Wray about the FBI's role in permitting the continuation of the Epstein sex trafficking ring.

295.    United States Senator Marsha Blackburn criticized the "FBI's failure to investigate the Epstein sex trafficking and CSAM allegations" and asked what had been done by the FBI to investigate. Senator Blackburn demanded:

> '"What we need from you is a complete investigation of why the FBI did not take this up and then getting to the bottom of what is appearing to be an enormous sex trafficking ring and then listening to these survivors…." She noted that, to no avail, she has sought the release of names of persons who flew on Epstein's plane and may have participated in the sex trafficking conspiracy. In response, FBI Director Wray stated, "it's been a while" and he would "get with my team and figure out if there is more information we can provide." It appears that, since that time, and despite numerous requests and opportunities, the FBI provided no further information and took no further action to listen to survivors.[82]

296.    On December 2, 2024, some eighteen months after Maria's May 2, 2023 letter raising her concerns and asking for an investigation, DOJ explained in a letter that the FBI's Internal Affairs Section/Initial Processing Unit [IAS/IPU] had "carefully reviewed" Maria's allegations, did "not initiate[]" an investigation, and could not reveal "specific[s]," but "IAS mandated action be [sic] taken to address the concerns raised in your complaint." The FBI concluded, "[T]he United States Department of Justice, Office of the Inspector General, IAS/IPU considers your complaint addressed."

---

[82] https://redstate.com/nick-arama/2023/12/05/blackburn-grills-wray-on-epstein-flight-logs-child-sex-rings-why-fbi-didnt-pursue-certain-cases-n2167215.

297.    Since that time, although there have been broad statements about making sure that "the American public knows the full weight of what happened in the past," no substantive revelations have been made.[83]

## W. The Horrific Impact on Maria

298.    For decades, Maria lived in constant fear of Epstein and Maxwell, who repeatedly managed to find and threaten her even when she moved and tried to hide from them.

299.    Maria has been stalked, harassed, and terrorized.

300.    Maria remains isolated from family and friends, afraid to meet neighbors or enjoy her life, and fearful for her safety. Having repeatedly reported Epstein and Maxwell to authorities and others to no avail, her sense of security, community, and justice is shattered.

301.    Maria suffers from complex PTSD, severe depression, constant anxiety, nightmares, debilitating fatigue, chronic illness, and various other physician and mental conditions. She is haunted by the knowledge that Epstein and Maxwell should have been stopped much earlier. If only Defendant had done its job, so many more young women and girls would not have been hurt, and she and others could have received assistance and experienced safety, care, and understanding so much earlier.

302.    Defendant's multiple breaches of these duties foreseeably, directly, and proximately caused both physical harm and severe emotional distress to Maria and other victims, which manifested in, among other things, depression, suicidal ideation, debilitating physical illness, panic attacks, loss of affection, loss of trust in others and the federal government, post-traumatic stress disorder, and much more.

---

[83] https://www.youtube.com/watch?v=kpdLFOo3qdE

303.    To her knowledge, Maria's claims have not been adequately investigated. To finally and fairly address her claims and obtain the long-overdue investigation of, and accountability for, Defendant's catastrophic failure to stop or curtail the Epstein sex trafficking conspiracy and child pornography crimes which Maria reported to Defendant more than a quarter of a century ago, Maria has no choice but to seek justice by bringing this lawsuit.

## CAUSE OF ACTION

## COUNT I: NEGLIGENCE

304.    The United States owed legal duties to Maria, who was sexually assaulted, stalked, harassed, and terrorized by Epstein and Maxwell.

305.    The United States had a non-discretionary obligation and duty, established by mandatory reporting statutes and MIOG directives, to investigate Maria's 1996 and 2006 reports of sexual abuse of minors, transportation of sexually charged images across state lines and other child pornography crimes, sex trafficking, and threats of physical violence, and to act against Epstein and to prevent him from committing repeated crimes.

306.    The United States breached those duties, delivering false and misleading communications to victims, and failing to notify Maria and other victims of their rights and services.

307.    The United States had a non-discretionary obligation and duty, established by the 2005 USAO Manual §§ 8-3.100, 8-3.110, 8-3.120 and related provision, 28 C.F.R. § 0.50, and elsewhere, to promptly notify the Civil Rights Division in writing of its sex trafficking investigation of Epstein, coordinate the investigation with the Civil Rights Division, defer to staffing decisions by the Civil Rights Division and keep the Civil Rights Division apprised of the investigation.

308.    The United States had a non-discretionary obligation and duty, established by the 2005 USAO Manual §§ 9-74.030, 8-3.100, 8-3.110, 8-3.120 and related provisions, 28 C.F.R. § 0.50, and elsewhere, to timely notify and involve the CEOS.

309.    The United States had a non-discretionary obligation and duty to follow their other written directives including the following: to prioritize child sex crime prosecution; to establish liaison with other law enforcement to help coordinate investigation of crimes against children and reduce child trauma; to issue accurate letters to victims regarding their investigation; to follow required procedures in 2005 USAO § 9-27.600 and elsewhere regarding non-prosecution agreements; to follow required procedures precluding granting unnamed co-conspirators full immunity; to enforce the terms of the non-prosecution agreement; to inform Maria and other victims of available victim remedies and rights; and to properly train law enforcement personnel dealing with crime victims.

310.    The United States knew or had reason to know that it was reasonably foreseeable that Epstein could, would, and was sexually trafficking children and young women and engaging in child pornography crimes because, among other things, numerous victims, including Maria, told federal investigators about the sexual abuse and exploitation and Maria and other victims complained of being physically threatened if they informed the authorities. Given the United States' actual or constructive knowledge of the risks posed by Epstein, the United States had a duty to protect Maria and other victims from Epstein's abuse and exploitation, to promptly and competently investigate allegations of such abuse and exploitation, and to protect victims from further harm.

311.    The relationship between the United States, Maria and other victims is direct and personal, and the dangers attending any breach of any duties were immediate and foreseeable. In

multiple ways and on many occasions over many years numerous agents of the United States —
including among others, FBI agents and members of the USAO -- breached their duty to protect
Maria and others from Epstein and others' sexual abuse and exploitation, to promptly and
competently investigate allegations of sexual abuse and exploitation, and to provide prompt and
effective protection.

312.    The United States was required by federal statutes, regulations, policies, practices,
and procedures to promptly, thoroughly, and competently investigate allegations of sex
trafficking, child sexual abuse and child pornography crimes.  The United States not only
promised, but also undertook actions to fulfill those promises, by engaging in specific tasks and
providing specific services, and it therefore voluntarily assumed the duty to do so competently.

313.    The United States' actions and inactions constituted negligence per se.

314.    None of Maria's claims are subject to any of the exceptions to sovereign
immunity found in 28 U.S.C. § 2680.

315.    The United States's breach of assumed duties foreseeably, directly, and
proximately caused both physical harm and severe emotional distress and personal injury to
Maria and other victims.

316.    Contrary to statutes and their own mandatory and non-discretionary policies and
procedures, the United States breached these duties to Maria and others, re-traumatized victims,
and for decades were effectively complicit in Epstein's sex trafficking of girls and young women
and production and possession in child pornography.

317.    The actions and omissions of the FBI and USAO seeded the continuation,
expansion and proliferation of Epstein's sex trafficking, abuse and child pornography for decades
which seriously injured Maria and countless others.

318.    If the United States had complied with its obligations and duties, Epstein would not have been able to continue to commit heinous crimes. The United States' repeated and continued failures, delays and inaction allowed Epstein and others to continue their sex trafficking conspiracy and child pornography for almost 25 years, subjecting Maria and other victims to nearly a quarter of a century of untold sexual abuse and exploitation, irreparable harm and injustice.

## COUNT II: NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

319.    Maria incorporates the allegations contained in all preceding paragraphs by reference.

320.    The United States owed duties to use due skill and care in addressing Maria's complaints to the FBI and in prosecuting Epstein.

321.    These duties of due skill and care were owed to Maria as a member of the general public and as a victim of sexual abuse, harassment and other crimes.

322.    The United States engaged in extreme and outrageous conduct, including misrepresentations to Maria and other victims regarding the investigation and prosecution of Epstein, the failure to provide proper protection, rights and services to victims, and the failure to report Maria's complaint to law enforcement,

323.    The United States breached its duties to Maria by acting in a negligent, careless, grossly negligent and reckless manner in failing to address Maria's complaints to the FBI, failing to timely follow mandates in the USAO Manual and elsewhere to inform and coordinate with the Civil Rights Division and the CEOS, failing to designate this matter as one of national interest, negligently and recklessly allowing a single USAO to prosecute Epstein, and in such negligent acts as may be disclosed through discovery.

324.    The United States intended to cause or disregarded a substantial probability of causing Maria severe emotional distress.

325.    As a result, Maria suffered severe emotional distress.

### REQUEST FOR RELIEF

326.    Maria respectfully requests that the Court enter judgment in her favor and against the United States, awarding the following to Maria:

A.    compensatory, consequential, general, and nominal damages, as well as all other available damages, against the United States in an amount to be determined at trial;

B.    the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses;

C.    pre– and post–judgment interest at the maximum legal rate; and

D.    such other and further relief as it deems just and proper.

Dated:  May 29, 2025

**MARSH LAW FIRM PLLC**

by:  /s/ Jennifer Freeman
Jennifer Freeman
D.C. Bar No. 90032494
*Admission to D.C. District Court pending
jenniferfreeman@marsh.law
James R. Marsh
D.C. Bar No. 436448
jamesmarsh@marsh.law
31 Hudson Yards, 11th Floor
New York, New York 10001
Phone: 212–372–3030
Fax: 833–210–3336

Attorneys for Plaintiff