UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| MARIA FARMER,<br><br>*Plaintiff,*<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>*Defendant.* | Case No.  1:25-cv-01709-RBW |

**PLAINTIFF'S RESPONSE TO ORDER TO SHOW CAUSE**

Plaintiff Maria Farmer [Maria], by her undersigned counsel, respectfully submits this response to the Court's July 1, 2025 Order to Show Cause why "the District of Columbia is the proper venue for the litigation of this case." Order to Show Cause [Order], Docket # 7. For the reasons set forth below, venue is proper in the District of Columbia, and transfer is not required or warranted.

The appropriate venue for a Federal Tort Claims Act claim is "the judicial district where the plaintiff resides or wherein the act or omission complained of occurred." 28 U.S.C. § 1402(b). Courts have made clear that so long as a substantial portion of the acts or omissions giving rise to the actions occurred in the District, even if more substantial acts or omissions and venue might lie elsewhere, venue is proper here. Here, Maria initially contacted the FBI in Washington, D.C. as well as New York in 1996. The FBI in Washington, D.C. located and interviewed Maria regarding the USAO investigation of Epstein in 2006. As detailed in a lengthy report issued by the Office of Professional Responsibility, Epstein appealed and sought review of the USAO's issuance of a non-prosecution agreement to high level officials in Washington, D.C. in 2008, including the Criminal Division Chief, CEOS, and the Deputy Attorney General. The

1

FBI/DOJ in Washington, D.C. recently examined and took action as to Maria's claims. Ultimately, this case involves mandatory policies and protocols of the FBI and USAO in Washington, D.C. The District remains a convenient location for all parties since documentary evidence has been consolidated and located here. Looking at the "sum total of events" which led to this lawsuit, the connections to Washington, D.C. are sufficient to warrant retention of venue here.

## FACTS

In the summer of 1996, Epstein sexually assaulted Maria Farmer in Ohio, where she was living as an artist-in-residence. Affirmation of Jennifer Freeman dated July 14, 2025 [Freeman Aff.] Exhibit [Ex.] A [Complaint] ¶95. Epstein also stole certain nude images from Maria in Ohio and then transported those images across state lines to New York and perhaps elsewhere. Complaint ¶¶98, 100-101. Maria was held against her will in Ohio, where Epstein contacted her, offering her compensation for his sexual abuse of her, ignoring her requests to return the images he stole from her, and threatening Maria with physical violence if she took any action to report him to the authorities or otherwise interfered with his actions. Complaint ¶¶103-108, 110. After she was able to escape from Ohio, Maria traveled to New York, where she had lived and worked before her summer in Ohio. Complaint ¶103. Epstein continued to threaten, harass, and ridicule her. Complaint ¶109. Maria began to understand the depravity of Epstein's misconduct, both in sexual abuse and child pornography. Complaint ¶111. For example, when she traveled for Epstein, she had seen binders with images of nude teens and young women at Epstein's Palm Beach mansion. Complaint ¶92. Maria then "did what she thought every American should do when they become crime victims, suspect children are sex crime victims and believe there is ongoing serious criminal activity. On August 29, 1996, she reported Epstein and Maxwell to law

enforcement." Complaint ¶112. She contacted the New York Police Department, who advised her to reach out to the FBI. Complaint ¶116.

Maria contacted the FBI in New York **and in Washington, D.C**. Complaint ¶117 & n.18. No one at the FBI from New York or Washington, D.C. responded to her, and it is not known at this time how, if at all, the FBI responded to her complaint. *See* Complaint ¶112.

Mandatory FBI policy required the FBI to investigate sexual exploitation of children and non-mail transportation of child pornography, with special priority" for "cases involving the…interstate…shipment of material depicting minors engaging in sexually explicit conduct." Complaint ¶57. It is not known what the FBI in New York or Washington, D.C. did regarding Maria's complaint regarding Epstein's pornography. It is also not known what the FBI in New York or Washington, D.C. did regarding the obligation of mandatory reporting to law enforcement.

Epstein's threats and harassment of Maria continued. Complaint ¶140. During the next several years, Maria moved to different states in an effort to hide from him and avoid his threats. Complaint ¶141.

In 2005, the USAO began investigating Epstein in Florida for sex trafficking and other claims. Federal statute and the USAO Manual mandated that the USAO promptly provide notice of sex trafficking investigations to the Civil Rights Division of the USAO in Washington, D.C. Such notice was required so that the Civil Rights Division could supervise the investigation of such claims. USAO Manual § 8-1.010; Complaint ¶¶201-202. The USAO was also mandated to keep the Civil Rights Division in Washington, D.C. apprised of the case's development, and the Civil Rights Division maintained ultimate authority over staffing sex trafficking cases. USAO Manual § 8-3.120; Complaint ¶214.

Similarly, the USAO was required by the USAO Manual to also notify the Child Exploitation and Obscenity Section of the Criminal Division of the U.S. Attorney's Office of all cases involving child sex trafficking. USAO Manual § 8-3.200; Complaint ¶211. Despite this requirement, the USAO did not timely involve the Child Exploitation and Obscenity Section, waiting over a year after the USAO was notified about the matter and was already in the process of resolving the matter via a non-prosecution agreement. Complaint ¶231. Any failure to follow these mandated protocols is a failure on the part of those ultimate decision-makers in Washington, D.C.

In 2006, the FBI reached out to Maria, then living in North Carolina, acknowledging that they knew that Maria had previously contacted the FBI. Complaint ¶176. In order to locate Maria, it appears that the FBI must have searched its records, which were presumably centralized in or organized through Washington, D.C. *See* Complaint ¶176.

In 2008, Epstein entered into a non-prosecution agreement with the USAO in Florida. Complaint ¶236. The USAO in Florida failed to comply with mandatory terms of the USAO Manual, set by the USAO in the District, such as terms regarding the immunity of Epstein and witnesses. Complaint ¶¶239-242. When the Florida USAO finalized the terms of the agreement, Epstein reached out to several federal officials at the Department of Justice in Washington, D.C., seeking their review of the agreement and in an effort to renegotiate the terms. Freeman Aff. Ex. B p. 101-110. For several months from 2007 to 2008, Epstein appealed to CEOS, the Department's Criminal Division, and then to the Office of the Deputy Attorney General. Freeman Aff. Ex. B, p. 103. The USAO Criminal Division Chief in Washington "performed a 'soup to nuts' review of the Epstein investigation," the CEOS also reviewed the matter, Epstein's defense team made multiple written submissions to the Criminal Division, and the Deputy

Attorney General "completed a thorough review" of the matter. Freeman Aff. Ex. B, pp. 101-110. In 2020, the Office of Professional Responsibility in Washington, D.C. issued a lengthy report examining the actions of the USAO in South Florida, following a lengthy investigation. Complaint ¶¶192, 287-288; Freeman Aff. Ex. B. In May 2023, Maria's attorneys wrote to the FBI, DOJ and Office of the Inspector General in Washington, D.C., asking for an investigation of the FBI's conduct. Complaint ¶291.

As per a letter dated December 2, 2024 from the FBI in Washington, D.C., the FBI/Department of Justice/Office of the Inspector General investigated Maria's claims. Freeman Aff. Ex. C. The FBI advised that the Internal Affairs Section, Initial Processing Unit [IAS/IPU], the entity responsible for investigating allegations of misconduct by FBI employees, "carefully reviewed [her] complaint and although an Internal Affairs investigation was not initiated, IAS mandated action be taken to address the concerns raised in [her] complaint." Complaint ¶21; Freeman Aff. Ex. C. The letter concluded that this matter has been deemed addressed by the Department of Justice, Office of the Inspector General. Complaint ¶21; Freeman Aff. Ex. C.

Finally, the U.S. Attorney General has recently advised that evidence relevant to this case has been consolidated in Washington, D.C. [Pam Bondi Under Scrutiny Over Jeffrey Epstein Client List Revelation - Newsweek](#). Complaint ¶124 (the Epstein file was "sitting on [Pam Bondi's desk"). The Department of Justice and the FBI have recently acknowledged their review of "investigative holdings relating to Jeffrey Epstein," which include "a large volume of images of Epstein, images and videos of victims who are either minors or appear to be minors, and over ten thousand downloaded videos and images of illegal child sex abuse material and other pornography." [fbi-memo-july-2025.pdf](#).

## ARGUMENT

5

The proper venue for a Federal Tort Claims Act claim is "the judicial district where the plaintiff resides or wherein the act or omission complained of occurred." 28 U.S.C. § 1402(b). Venue is proper using a "commonsense application" to uphold venue where "sufficient activities giving rise to the plaintiff's cause of action took place here." *Franz v. U.S.*, 591 F. Supp. 374, 378 (D.D.C. 1984).

Courts have interpreted these venue requirements in accordance with the similar requirements of 28 U.S. § 1391, which refers to "the judicial district... in which the claim arose." *See, e.g., Thornwell v. United States*, 471 F. Supp. 344, 356-57 (D.D.C. 1979) (upholding D.C. District Court venue). As the D.C. Circuit has explained, these venue provisions "counsel[] against adherence to mechanical standards in its application" and instead venue is to be "ascertained by advertence to events having operative significance in the case, and a commonsense appraisal of the implications of those events for accessibility to witnesses and records." *Lamont v. Haig*, 590 F.2d 1124, 1134 (D.C. Cir. 1978). As to venue, the "choice of a single district is a much more difficult undertaking when sophisticated multistate activities of relative complexity are in issue." *Lamont v. Haig*, 590 F.2d 1124, 1133 (D.C. Cir. 1978). The D.C. Circuit has warned against "the often unfruitful pursuit of a single locality as the one and only district in which the claim arose," instead conferring venue "in a district where a substantial portion of the acts or omissions giving rise to the actions occurred, notwithstanding that venue might also lie in other districts." *Id*.

Venue is proper in a district where a "substantial portion of the relevant events occurred" and that district "need not be 'the district where the *most substantial* portion of the relevant events occurred…." *Bullock v. Washington Metro. Area Transit Auth.*, 943 F. Supp.2d 52, 57 (D.D.C. 2013). Venue can be "proper in multiple districts…." *Cold Spring Harbor Lab'y v. Ropes*

6

*& Gray LLP*, 762 F. Supp. 2d 543, 553 (E.D.N.Y. 2011). "A plaintiff is not required to establish that his chosen venue has the most substantial contacts to the dispute; rather, it is sufficient tha a substantial part of the events occurred in that venue, even if a greater part of the events occurred elsewhere." *National Council on Compensation Ins., Inc. v. Caro & Graifman, P.C.*, 259 F. Supp.2d 172 (D. Conn. 2003). Venue substantiality is "more a qualitative than a quantitative inquiry, determined by assessing the overall nature of the plaintiff's claims and the nature of the specific events or omissions in the forum, and not by simply adding up the number of contacts." *Cold Spring Harbor*, 762 F. Supp. 2d at 553 (internal quotation omitted). "In other words, the plaintiff's choice of a forum is honored 'if the activities that transpired in the forum district were not insubstantial in relation to the totality of events giving rise to plaintiff's grievance.'" *Franz v. United States*, 591 F. Supp. at 378 (quotation and citation omitted).

      In *Franz*, a divorced parent, on behalf of himself and his children, brought litigation under the FTCA against the United States, the Department of Justice, and the U.S. Marshals Service in the District Court for the District of Columbia, seeking visitation rights with his children who had been placed into the witness protection program. The children previously were residents of Pennsylvania, the U.S. Marshals Service, based in Virginia, administered the program from Virginia, the U.S. Attorney General retained "overall responsibility" for the program's policies and administration, and the Justice Department decided to place the children in the program and had some involvement in the parent's attempt to enforce the visitation rights in a Pennsylvania court. The parent sued in the D.C. District Court, and the Department of Justice challenged venue, contending that venue would be more appropriate in Pennsylvania or Virginia. *Franz*, 591 F. Supp. at 376.

The D.C. District Court declined to change venue, noting that the "Department [of Justice] and the Attorney General retained overall responsibility for the administration of the Program's witness protection and maintenance policies." *Id*. at 378. The Court noted that "even if the decision to deny Mr. Franz' visitation request was not dictated by officials at the Justice Department in Washington, D.C., [...] the Department was more than peripherally involved in the course of events leading up to this litigation." *Id*. at 379. The court also noted that the location of documentary evidence in the District, which would streamline the discovery process, has also been viewed as relevant to a determination of venue. *Id*. In concluding that venue was proper in the District, the Court declined to "gloss[] over the Department[of Justice]'s responsibility for administering the Witness Protection Program," rejected an "extremely narrow interpretation of section 1402(b)," and looked to the "sum total of events which resulted in th[e] lawsuit," deeming those events "not insubstantial." *Id*. at 377, 378.

Courts that have refused venue in the District of Columbia have generally done so based solely or primarily on the location of a federal agency's headquarters here, with little or no additional tie(s) to the District. *See*, e.g., *Bartel v. F.A.A.*, 617 F. Supp. 190 (D.D.C. 1985) (venue inappropriate in the District of Columbia where no tortious actions occurred in the District and the location of the FAA's principal office in the District was the only connection with the District); *Spotts v. U.S.,* 562 F. Supp.2d 46 (D.D.C. 2008) (venue in the District of Columbia was not appropriate solely because the Bureau of Prisons resided in the District, and venue transferred to Texas where prisoners were held); *Head v. Federal Bureau of Prisons*, 86 F.Supp.3d 1 (D.D.C. 2015) (venue in the District of Columbia was not appropriate because plaintiff was serving a sentence outside of the District of Columbia and there was no allegation that conduct giving rise to plaintiff's claims occurred in the District of Columbia).

Similarly, in *Cameron v. Thornburgh*, 983 F.2d 253 (D.C. Cir. 1993), cited in this Court's Order to Show Cause (p. 2), the D.C. Court of Appeals rejected venue in the D.C. District Court, expressing concern that the *pro se* plaintiff-prisoner, in his challenge to a failure to transfer him from an Indiana prison in light of his need for a low-sodium diet, might have named federal officials as defendants in order to manufacture venue in the District. The appeals court also noted, "Appellant's complaint did not allege a single rule or policy emanating from Washington that had affected his case." Id. at 255.

In this case, substantial events occurred and should have occurred in the District, substantial mandatory federal policy affects this case, and these events and policies ground venue here. At the very outset of the relevant facts, in 1996, Maria contacted the FBI in Washington, D.C., along with the FBI in New York, to report Epstein. Complaint ¶117 & n.18. In or about 2008, Epstein appealed the terms of the proposed USAO's non-prosecution agreement to top officials in Washington, D.C., including the Chief of the Criminal Division who did a "soup to nuts" review, the CEOS, and the Deputy Attorney General who performed a "thorough review." Freeman Aff. Ex. B, pp. 101-110.

Other federal entities/agencies in Washington, D.C. have extensively reviewed documents and interviewed witnesses regarding the USAO's handling of the Epstein investigation, including the Office of Professional Responsibility. Freeman Aff. Ex. B. In addition, as per the December 2, 2024 letter, the IAS/IPU in Washington, D.C. reviewed Maria's concerns, took action on those concerns, and declared the matter addressed. Complaint ¶21; Freeman. Aff. Ex. C. Thus, at numerous times, several federal entities in Washington, D.C. have participated and acted in this case. The ultimate arbiters of Epstein's investigation and non-prosecution agreement, whether through mandatory federal policies or by reviewing actions by

the FBI in New York or Washington, D.C. or USAO in Florida, were located in the District. Unlike the *Cameron* decision, these facts demonstrate far more than marginal or trumped-up allegations of involvement by D.C. government officials.

Moreover, the legal bases for this case arise from and are centered in Washington, D.C. as per the mandatory policies of the FBI and the USAO which govern the determination of Maria's claims. The Civil Rights Division and CEOS, located in Washington, D.C., were required by applicable law and policy to handle or supervise investigations of sex trafficking, including those of Epstein. Complaint ¶201.  Indeed, the USAO's failure to properly and timely involve entities and supervise the investigations in the District constitute two of the central allegations in this case. Complaint ¶133-137, 201-217. Unlike the *Cameron* decision, many rules and policies emanating from Washington, D.C. affect Maria's case, including several FBI and USAO Manual requirements.  Complaint ¶¶133-137, 201-217.  Similarly, Maria in her Complaint alleges that mandatory federal policies stemming from Washington, D.C. should have governed Epstein's non-prosecution agreement, such as the bases for immunity grants, but the USAO failed to comply with those requirements.  Complaint ¶¶239-242.

As in *Lamont*, "sophisticated multistate activities of relative complexity are in issue" here, with events occurring in Ohio, New York, Florida, North Carolina, Washington, D.C. and elsewhere. *Lamont*, 590 F.2d at 1133. As in *Franz*, although venue might lie in other districts, by taking action, issuing policies, and maintaining ultimate authority over various aspects of this case, Washington, D.C. was "more than peripherally involved in the course of events leading up to this litigation," and instead had substantial involvement in the case. *Franz*, 591 F. Supp. at 378.

Further, the FBI and USAO have consolidated the Epstein files here in the District and some of them, such as files regarding the IAS/IPU investigation, were created and exist only in the District where that investigation took place. *See* Freeman Aff. Ex. C.

Ultimately, the sum total of events relating to Washington, D.C. which resulted in Maria's lawsuit is "not insubstantial," and transfer to another jurisdiction "glosses over the Department[of Justice]'s [and FBI's] responsibility for" administering FBI and USAO mandatory policies. *Franz*, 591 F. Supp. at 377, 378. Although there are some significant connections with this case to states such as New York and Florida, Maria was not sexually assaulted in either of those states and was exploited and threatened in many states. As in *Franz*, Maria's choice of forum should be honored.

Finally, this Court's transfer of *Jane Doe 1, et al. v. United States*, Civ. Action No. 24-2743 (RBW), ECF No. 25-2 out of Washington, D.C. is not dispositive. In that case, the plaintiffs in their Second Amended Complaint (Freeman Aff. Ex. D) did not allege the numerous factual connections of this case with Washington, D.C., and did not detail in their Amended Complaint the numerous failures to follow specific mandatory Washington, D.C. based-policies of the FBI and USAO. Indeed, those plaintiffs focused primarily on the acts and omissions of the FBI and did not specify any particular mandatory policy violated by the USAO. Nor did the Second Amended Complaint allege the plaintiffs' personal connection to Washington, the D.C. participation in the Epstein matter, or sophisticated multistate activities of relative complexity as in Maria's Complaint. While the two cases both stem from Maria's report of Epstein to the FBI in 1996 and the United States' failure to take action on that report, and thus share some factual similarities, Maria's complaint is far more detailed, alleging greater factual and legal participation and connections to and oversight by Washington, D.C.

## CONCLUSION

      For the reasons set forth above, venue in the District of the District of Columbia is proper and warranted.

Dated: July 14, 2025

                                              Respectfully submitted,

                                              Jennifer Freeman
                                              D.C. Bar No. 90032494
                                              *Admission to D.C. District Court pending
                                              jenniferfreeman@marsh.law
                                              James R. Marsh
                                              D.C. Bar No. 436448
                                              jamesmarsh@marsh.law
                                              31 Hudson Yards, 11th Floor
                                              New York, New York 10001
                                              Phone: 212–372–3030
                                              Fax: 833–210–3336

                                              Attorneys for Plaintiff