**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| MARIA FARMER,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | ) | Civil Action No. 25-1709 (RBW) |

# MEMORANDUM OPINION

The plaintiff, Maria Farmer, filed this case based upon allegations that "[f]or nearly a quarter of a century, Jeffrey Epstein, the infamous sex trafficker and abuser of minors and young women, along with his co-conspirators, [were] able to engage in a wide-ranging sex trafficking venture" due to alleged failures of the defendant, the United States of America. See Complaint ("Compl.") ¶ 1, ECF No. 1. Specifically, the plaintiff alleges that the defendant and several of its components, the Federal Bureau of Investigation ("FBI"), the United States Department of Justice ("DOJ"), and United States Attorneys' Offices ("USAOs"), "failed to listen to or protect" the alleged victims of Epstein and his co-conspirators' alleged sex-trafficking, sexual abuse, and sexual exploitation. Id. The plaintiff brings this civil action against the defendant pursuant to the Federal Torts Claim Act ("FTCA"), 28 U.S.C. §§ 2671–80, alleging negligence and negligent infliction of emotional distress. Id. ¶¶ 304–25.

Pending before the Court is the issue whether venue is proper in this Court. Based on the submissions of the parties,[1] and because this case is substantially the same as another case the

[1] In addition to the filings already identified, the Court considered the following submissions in rendering its decision: (1) the Notice of Designation Of Related Civil Cases Pending In This Or Any Other United States Court
(continued . . .)

Court previously transferred to the Southern District of Florida, in the interest of justice, this case will also be transferred to the Southern District of Florida.

## I. BACKGROUND

### A. Factual Background

In the mid-1990s, the plaintiff began working for Epstein, first as an "art scout," and then in many different positions such as a "receptionist, clerk, and [various] other duties in [his] New York City mansion." Compl. ¶¶ 81–82, 85. While working in Epstein's New York City mansion, the plaintiff alleges that she "witnessed many young women going in and out of . . . [the] mansion, including children[.]" Id. ¶ 86. "Epstein repeatedly promoted himself to young artists and actresses as a philanthropist interested in helping them achieve their educational and professional dreams. Id. ¶ 83. The plaintiff also alleges that she "witnessed [Ghislaine] Maxwell actively 'scouting' for new teenage girls[.]" Id. ¶ 86. "Epstein and Maxwell also bragged about a 'modeling book' that was so valuable, important, and private that they kept it locked in Epstein's safe." Id. ¶ 90. The plaintiff alleges that "[t]his 'modeling book,' which they shared with others occasionally, contained images of what appeared to be children explicitly posed in various stages of undress." Id. Additionally, the plaintiff alleges that she "saw binders with images of nude teens and young women at Epstein's Palm

(. . . continued)
("Notice of Related Case"), ECF No. 2; (2) the Plaintiff's Response To Order To Show Cause ("Pl.'s Resp."), ECF No. 8; (3) Pl.'s Resp., Exhibit ("Ex.") 1, Affirmation Of Jennifer Freeman In Support Of Plaintiff's Response To Order To Show Cause, ECF No. 8-1; (3) Pl.'s Resp., Ex. 1, DOJ Office of Professional Responsibility Report: Investigation into the U.S. Attorney's Office for the Southern District of Florida's Resolution of Its 2006–2008 Federal Criminal Investigation of Jeffrey Epstein and Its Interactions with Victims during the Investigation (Nov. 2020) ("OPR Report"), ECF No. 8–3; (4) Pl.'s Resp., Ex. 1, Initial Processing Unit, Internal Affairs Section, Inspection Division ("IAS/IPU") Letter from IAS/IPU to Freeman (Dec. 2, 2024) ("IAS/IPU Letter"), ECF No. 8-4; (5) the Defendant's Response To Plaintiff's Response To The Court's July 1, 2025, Show Cause Order ("Def.'s Resp."), ECF No. 11; (6) a Sealed Document filed by Maria Farmer, ECF No. 14; (7) Maria Farmer's Letter to the Court (July 22, 2026) ("Farmer Letter"); and (8) Maria Farmer's Amended Notice Of Intent Regarding Public Docketing (July 23, 2026).

Beach[, Florida] mansion[,]" id. ¶ 92, and that "Epstein's homes were filled with photographs and other sexualized artwork featuring nude females, some of whom appeared to be minors, including partially naked images[,]" id. ¶ 93.

Then, "[i]n the summer of 1996, Epstein encouraged [the plaintiff] to leave New York City . . . and become a summer 'artist-in-residence' at his home in New Albany, Ohio." Id. ¶ 95. While the plaintiff was in his home in New Albany, Ohio, she alleges that "Epstein and Maxwell sexually assaulted" her and stole "nude images of two [of the plaintiff's] minor siblings" that the plaintiff kept "for her personal use in her artwork[.]" Id. ¶¶ 97–98. According to the plaintiff, Epstein and Maxwell "transported these images via airplane from Ohio to New York." Id. ¶ 99.

The plaintiff "became frightened that Epstein . . . had . . . [also] assaulted one of her minor sisters as well as other children[,]" id. ¶ 102, and "attempted to leave Epstein's New Albany residence to return to her home in New York . . . and report Epstein[] and Maxwell[]" to law enforcement. Id. ¶ 103. However, the plaintiff alleges that "for many days, [she] was physically threatened by a local Sheriff and other persons . . . and [was] prevented from leaving the New Albany property." Id. The plaintiff also alleges that Epstein "attempt[ed] to trivialize the sexual assault," admitted to taking the images from the plaintiff, and "attempt[ed] to pay her off." Id. ¶¶ 104–06. When the plaintiff was finally "'permitted' to leave" New Albany, she returned to New York and "confronted Epstein and Maxwell, demanding, among other things, that they return the stolen photographs of her sisters." Id. ¶¶ 107–09. According to the plaintiff, Epstein and Maxwell "refused, ridiculed her, and retaliated against her, threatening to physically harm her and her family and to burn all [of] her artwork." Id. ¶ 109.

Subsequently, "[o]n August 29, 1996, [the plaintiff] reported Epstein and Maxwell . . . to the New York Police Department's Sixth Precinct ('NYPD')." Id. ¶¶ 112–13. "The NYPD

explained that they could only address" Epstein's threats "to burn [the plaintiff's] painting" "and that she needed to report her additional allegations to the FBI." Id. ¶¶ 115–16. The plaintiff alleges that the NYPD "gave her the FBI's telephone" number. Id. ¶ 116. The plaintiff then made "at least two calls to two different offices" and alleges that "it appears that [she] may well have contacted the FBI in Washington, DC rather than just a local NY field office." Id. ¶¶ 117 & n.18. In one her calls to the FBI, the plaintiff alleges that "the FBI abruptly hung up on her" and "made no effort to meet with [her] or otherwise follow up." Id. ¶¶ 121–22.

The plaintiff alleges that "no one from the FBI reported [her] 1996 complaint to the [NYPD], state of local law enforcement, or child welfare officials[,]" or contacted her, despite various federal policies and requirements, which consequently "allow[ed] Epstein's unchecked abuse of children and young women to continue unabated for decades." Id. ¶¶ 133–34. Additionally, the plaintiff alleges that the defendant's inaction allowed "Epstein and Maxwell [to] continue[] their reign of terror over [the plaintiff] and her family" and caused her to flee "New York City and then the New York region[,]" "relocate[] repeatedly, [and] sometimes even us[e] a different name[,]" "to escape [their] ongoing abuse and threats. Id. ¶¶ 140–42. "As a result of Epstein's and Maxwell's misconduct and the FBI's failures, [the plaintiff alleges that her] health and well-being deteriorated and spiraled downward." Id. ¶ 148.

Then, in 2006, after "the FBI learned that Epstein recruited underage girls . . . to travel to his homes in Palm Beach[, Florida] and New Mexico, where he would sexually assault them[,]" the plaintiff alleges that FBI agents "arrived unannounced at [her] home in North Carolina" and "met with [her] for several hours." Id. ¶¶ 170, 176. "The FBI agents told [the plaintiff] that they needed her testimony for an investigation of Epstein in Florida[,]" which resulted in the plaintiff cooperating with the agents. Id. ¶¶ 178–85. However, despite the plaintiff's cooperation in

2006, she alleges that the defendants still "utterly failed to competently follow federal law requirements concerning the investigation and prosecution of Epstein's sex trafficking crimes[,]" id. ¶ 226; see id.¶¶ 186–225, 227–31, including "grant[ing] [him] the 'deal of a lifetime'—an extraordinary secret [non-prosecution agreement (']NPA[')]—allowing [him] to plead [guilty] to two minor state-law crimes while 'immunizing' [the conduct of] his co-conspirators[,]" id. ¶ 236; see id. ¶¶ 232–35.

**B. Procedural History**

On May 29, 2025, the plaintiff filed her Complaint. See generally Compl. That same day, the plaintiff filed a notice of a related case. See generally Notice of Related Case. In the plaintiff's related case notification, she represented that another case previously assigned to the undersigned, Doe 1 v. United States, No. 24-cv-2743 (RBW) (D.D.C. 2025) "involve[d] common issues of fact." Id. at 1.

The Court subsequently transferred the Doe 1 case to the United District Court for the Southern District of Florida after finding that venue was not proper in this Court. See No. 24-cv-2743 (RBW), Order (D.D.C. June 30, 2025) at 1, ECF No. 35. Specifically, the Court found that the plaintiffs' claim that venue was proper in the District of Columbia ("D.C.") simply because D.C. is the "epicenter of where [the] FBI investigation [of Epstein] had been taking place" and "all of the evidence concerning Epstein over the past 20 years ha[d] been sent to D.C." was inadequate because, as the Court explained, finding that venue was proper here "would be the situation in every case involving these types of allegations." Doe 1, No. 24-cv-2743 (RBW), June 16, 2025 Hearing Transcript ("Doe 1 Hr'g Tr.") at 3:13–3:17, ECF No. 34. Namely, the plaintiffs argued that, in 2005, "the Crimes Against Children Unit [in D.C.] was involved[,]" in the investigation of Epstein, and "the Child Exploitation and Obscenity Section would have

[also] been involved" because there was "child sexual abuse materials." Id. at 3:19–4:2. The plaintiffs in DOE 1 alleged that because "Epstein was sex-trafficking women globally[,] . . . it [was the plaintiffs'] belief that the [District of Columbia] headquarters would have been involved in overseeing the Florida field office and also the New York field office[.]" Id. at 4:2–10. In rejecting the plaintiffs' venue argument, the Court found that "all of the work [in the government's investigations of Epstein] would have clearly been done either in the Southern District of Florida . . . or in New York" "where the[] events allegedly occurred," id. at 10:17–10:19, and in many instances where "investigations [ ] are taking place in other parts of the country . . . [, FBI] headquarters becomes involved to some degree[,]" id. at 10:11–10:14. However, the Court reasoned, that "doesn't necessarily mean that venue ends up being vested [ ] in the District of Columbia." Id. at 10:14–10:16.

Because the plaintiff represented that her case involves issues of fact common to those in Doe 1, on July 1, 2025, the Court issued an order to show cause why "the District of Columbia is the proper venue for the litigation of this case." See Order at 1 (July 1, 2025), ECF No. 7. The plaintiff responded to the Court's order to show cause on July 14, 2025, see generally Pl.'s Resp., and the defendant filed its response on July 28, 2025[,]" see generally Def.'s Resp. And, the Court held a show cause hearing on August 8, 2025. See Minute ("Min.") Entry (Aug. 8, 2025).

## II. STANDARD OF REVIEW

"Venue as to [the] plaintiff's Federal Tort Claims Act claim is governed by 28 U.S.C. § 1402(b), the general venue statute governing suits in which the United States is a defendant." Bartel v. Fed. Aviation Admin., 617 F. Supp. 190, 198 (D.D.C. 1985). Under that provision, FTCA suits "may be prosecuted only in the judicial district where the plaintiff resides or wherein

the act or omission complained of occurred." 28 U.S.C. § 1402(b). "Under the prevailing interpretation of section 1402(b), venue is proper in the District of Columbia if sufficient activities giving rise to the plaintiff's cause of action took place here." Franz v. United States, 591 F. Supp. 374, 378 (D.D.C. 1984). It is the plaintiff's burden "to establish that venue is proper since it is 'the plaintiff's obligation to institute the action in a permissible forum.'" Exelon Generation Co., LLC v. Grumbles, 380 F. Supp. 3d 1, 9 (D.D.C. 2019) (quoting Ananiev v. Wells Fargo Bank, N.A., 968 F. Supp. 2d 123, 129 (D.D.C. 2013)).

"Courts in [the District of Columbia] must examine challenges to . . . venue carefully to guard against the danger that a plaintiff might manufacture venue" here. Cameron v. Thornburgh, 983 F.2d 253, 256 (D.C. Cir. 1993). "By naming high government officials as defendants, a plaintiff could bring a suit here that properly should be pursued elsewhere." Id. "While the Court accepts the factual allegations in the Complaint regarding venue as true, it need not accept the plaintiff's legal conclusions as true, and may consider material outside the pleadings, including undisputed facts evidenced in the record, to determine whether it has [venue] in the case." Grumbles, 380 F. Supp. 3d at 9 (quoting Ebron v. Dep't of Army, 766 F. Supp. 2d 54, 57 (D.D.C. 2011)). In order to determine if venue is proper, the Court "engage[s] in 'a commonsense appraisal' of 'events having operative significance in the case.'" Id. (quoting Lamont v. Haig, 590 F.2d 1124, 1134 (D.C. Cir. 1978)). "[A] plaintiff's choice of forum is afforded great deference, and is a paramount consideration in any determination of" whether to transfer venue. Shawnee Tribe v. United States, 298 F. Supp. 2d 21, 24 (D.D.C. 2002) (internal quotations omitted). "However, that choice is conferred less deference by the court when a plaintiff's choice of forum is not the plaintiff's home forum." Id. (citing Piper Aircraft Co. v. Reyno, 454 U.S. 235, 255–56 (1981)).

## III. ANALYSIS

### A. Whether Venue is Proper in the Court

Because it is undisputed that the plaintiff does not reside in the District of Columbia, see generally Sealed Document filed by Maria Farmer, the Court must only assess whether the alleged "act[s] or omission complained of occurred" in the District of Columbia. 28 U.S.C. § 1402(b).

The plaintiff argues that "substantial events occurred and should have occurred in [this] District, substantial mandatory federal policy affects this case, and these events and policies ground venue here." Pl.'s Resp. at 9. Specifically, with more force than what is included in her Complaint, the plaintiff represents in her response to the Court's order to show cause that she "contacted the FBI in Washington, D.C., along with the FBI in New York, to report Epstein" in 1996. Contrast id. with Compl. ¶¶ 116–17 & n.18 (representing that the NYPD "gave [the plaintiff] the FBI's telephone contact information which she believes had an area code as part of the phone number[, and p]rior to 2003, phone calls within New York City did not require using an area code [so,] it appears that [she] may well have contacted the FBI in Washington, DC rather than just a local NY field office."). Additionally, the plaintiff alleges, inter alia, that: (1) "no one from the FBI reported [her] 1996 complaint to the New York State Police, state or local law enforcement, or child welfare officials"; (2) "the FBI failed to follow up with [the plaintiff], inform her of her rights as a crime victim under the [Victims' Rights and Restitution Act ('])VRRA[')], undertake a multi-disciplinary child abuse investigation or prosecution, or try to reduce [the plaintiff's] trauma or the endless trauma of countless child victims[;]" and (3) "the FBI failed to contact Ohio authorities to investigate [the plaintiff's] report." Compl. ¶¶ 133–35. Moreover, the plaintiff alleges that "the USAO failed to promptly notify the Civil Rights

Division of the Epstein sex trafficking investigation[;]" and did not do so until "nearly six months after Epstein and the USAO signed the NPA and some two years after the USAO knew about Epstein's sexual abuse and trafficking of minor children and young women[.]" Id. ¶¶ 217–18. Overall, the plaintiff contends as the basis for her claims that the FBI field office in New York, and perhaps in the District of Columbia, as well as the USAO in the Southern District of Florida failed to comply with reporting requirements which amounted to negligence and negligent infliction of emotional distress by the defendant. See generally Compl.

The defendant counters that the "mere allegations of limited involvement, if any, by the FBI or the Department [of Justice] over the course of the last thirty-years, does not give rise to a plausible inference that a 'substantial part' of the acts or omissions occurred in this District." Def.'s Resp. at 9. Additionally, the defendant argues that "there is a dearth of allegations that senior officials made or directed decisions regarding the Epstein investigation or subsequent prosecution, and there is no plausible allegation that officials in Washington, D.C. directed FBI agents in other jurisdictions to ignore or fail to follow up on credible tips of criminal activity." Id. at 11. The defendant further argues that, hypothetically, "even if officials at the FBI or the Department of Justice headquarters office may have participated in or made the decision to direct (or not) the contours of the FBI's investigation in Miami or New York, the effects of that decision plainly did not occur in this district." Id. at 9.

For the reasons explained below, the Court agrees with the defendant that the "totality of events giving rise to [the] plaintiff's grievance," Thornwell v. United States, 471 F. Supp. 344, 356 (D.D.C. 1979), by the several components of the defendant did not emanate from the District of Columbia, but instead arose from events that occurred in either New York, Southern Florida, Ohio, or North Carolina. See Bartel, 617 F. Supp. at 199 (explaining that although federal

agencies may be headquartered in the District of Columbia, that is "entirely irrelevant to the statutory [analysis of 28 U.S.C. § 1402(b)], and [ ] obviously cannot constitute a basis for concluding that venue is appropriate in this District"). Accordingly, for the following reasons, venue is more appropriate in one of those other Districts.

First, the plaintiff does not allege that any of the alleged sexual assault, threats, harassment, stalking, and other harms she experienced or witnessed due to the acts of Epstein and Maxwell occurred in Washington, D.C. See generally Compl. Instead, the plaintiff contends that these harms occurred in New York, Ohio, and Florida. See id. ¶¶ 86–111. Specifically, the plaintiff alleges that when she told the FBI's field offices in New York and North Carolina of these harms, those offices failed to report and follow proper procedures in handling their investigations of those allegations both in 1996 and 2006. See id. ¶¶ 112–39. But, the defendant's field offices' alleged failures are insufficient to establish that the Washington, D.C. headquarters was responsible for those acts or omissions. See Spotts v. United States, 562 F. Supp. 2d 46, 55 (D.D.C. 2008) ("[M]ere involvement on the part of federal agencies who are located in Washington, D.C. is not determinative" in the court's venue determination).[2] And, although the plaintiff may well be correct that the policies she alleges were not followed were created in this District, the component or components of the defendant who did not adhere to the policies were located elsewhere. See Bullock v. Washington Metro. Area Transit Auth., 943 F. Supp. 2d 52, 58 (D.D.C. 2013) (finding that evidence and records of policies and procedures connected "to the District of Columbia do not suffice to show that this district is where a

[2] The plaintiff speculates that because the FBI agents who arrived at her home in North Carolina in 2006, "advised [her] that they knew that she had previously complained to the FBI about Epstein" in 1996, "FBI headquarters was aware of or may have been involved with her prior report." Compl. ¶¶ 176–77. It is surely plausible that FBI headquarters may have been aware of complaints against Epstein and his co-conspirators in 2006, but the FBI agents' interview of the plaintiff in 2006 seemingly demonstrates that the agents sought "her testimony for an investigation of Epstein in Florida[,]" id. ¶ 178, rather than for its use by the defendant's offices in this District.

substantial part of the events or omissions giving rise to the claim occurred"). If the Court were to find venue proper in this Court in every case where a plaintiff alleges that policies and procedures created in the District of Columbia were not followed in other parts of the country, this Court would be inundated with lawsuits from litigants all over the country who have grievances against the federal government. Additionally, while the Court accepts the plaintiff's representation that she "may" have contacted the FBI in Washington, D.C. in 1996 as true, she can only speculate as to whether this actually occurred, whereas, she plausibly alleges that she contacted law enforcement in New York during that same time period. See Compl. ¶¶ 112–17; cf. id. ¶ 126 (showing a picture of the FBI notes from the plaintiff's 2006 meeting with agents that shows that the FBI noted that the NYPD "6th precinct told [the plaintiff] to call FBI").

However, according to the plaintiff's allegations, the District of Columbia offices of the defendant's several components had some role in Epstein's 2008 prosecution, or failure to do so, in the Southern District of Florida. The plaintiff has provided a report from November 2020 created by the Department of Justice Office of Professional Responsibility, which notes that the former United States Attorney for the Southern District of Florida, Alexander Acosta, asked the Child Exploitation and Obscenity Section ("CEOS"), which is based in Washington, D.C., "to 'come on board'" when Epstein's defense team met with federal prosecutors in the Southern District of Florida. See OPR Report at 102; Compl. ¶ 229. The CEOS Chief, Andrew G. Oosterbaan, agreed to "designate an attorney [that] ha[d] 'a national perspective' to conduct a fresh review," and "assigned a CEOS Trial Attorney . . . [who] traveled to Florida to review the case materials, and [ ] meet with [a prosecutor in the Southern District of Florida] to discuss the case and interview . . . victims." See OPR Report at 102. After those things occurred, it appears that the "CEOS['s] role [in the case was limited] to review [involvement] only," id. at 105, and

the "CEOS [ ] concluded that [the] 'federal prosecution [of Epstein] would not be improper or inappropriate' and that Acosta 'could properly use his discretion to authorize prosecution in th[e] case[,]'" id. at 107 (citing a purported letter from Chief Oosterbaan to Epstein's defense team).

Then, after Epstein's defense team lodged further appeals to senior officials in the DOJ's District of Columbia offices challenging the Southern District of Florida's prosecution of Epstein, "John Roth, a Senior Associate Deputy Attorney General[,] . . . [performed a] limited [ ] review [of] written materials submitted [to the Deputy Attorney General's office] by Epstein's attorneys[,]" an assistant united states attorney in the Southern District of Florida, and the CEOS. Id. at 108–09. While Roth was reviewing these materials, he "instructed the USAO [in the Southern District of Florida] to rescind the deadline" that Epstein had previously been given to comply with the NPA by the Southern District of Florida. Id. at 108. However, Roth "did not review the terms of the [NPA] or ratify it post hoc." Id. at 109. Ultimately, Roth sent Epstein's defense team, which included Ken Starr and Jay Lefkowitz, "a brief letter . . . informing them that the [Deputy Attorney General's] office had 'completed a thorough review' of the USAO's handling of the Epstein matter and did not believe intervention by the Deputy Attorney General was warranted in view of the 'considerable discretion' vested by the Department in U.S. Attorneys." Id. at 110.

Therefore, it appears that in regards to the actions the defendant took or failed to take around 2008 regarding Epstein's criminal prosecution, certain decisions "emanat[ed] from Washington" and affected Epstein's case insofar as senior officials in the District of Columbia directed the USAO in the Southern District of Florida to temporarily "rescind the deadline" by which Epstein had to comply with the NPA. See e.g., Cameron, 983 F.2d at 257 (determining whether, pursuant to 28 U.S.C. § 1391(b), "a substantial part of the events or omissions giving

rise to the claim occurred" by analyzing whether "policy decisions made in Washington ultimately affected [a plaintiff's] treatment at" a facility in Indiana). But ultimately, the senior officials in the District of Columbia, after their brief review of Epstein's case, chose not to derail the decisions being made in the Southern District of Florida. Thus, if the Court were tasked with reviewing whether venue was proper in this District based mainly on the events regarding Epstein's investigation and criminal case in 2008, then the Court would likely be more inclined to find that venue is proper in this Court. However, because the task is to determine "if sufficient activities giving rise to the plaintiff's cause of action [in total] took place" in this District, Franz, 591 F. Supp. at 378, the Court cannot limit its analysis to only the 2008 events that the plaintiff alleges, see id. (explaining that venue was proper in the District of Columbia, in part, because "[t]he decision to place the Franz children in the [Witness Protection] Program was made exclusively by Justice Department officials in Washington, D.C.").

Instead, as discussed above, the Court finds that a "substantial part of the events or omissions giving rise to [the plaintiff's] claim occurred," see id., in 1996 when she was living in New York and reported Epstein and Maxwell to the FBI, and again in 2006, when she was living in North Carolina and FBI agents interviewed her as part of their investigation of Epstein being conducted in the Southern District of Florida.[3] Moreover, the long-term injuries and health-related deterioration that the plaintiff alleges she experienced "[a]s a result of Epstein's and

---

[3] The plaintiff has also provided the Court with a copy of a December 2, 2024, letter from the Initial Processing Unit of the Internal Affairs Section, Inspection Division, of the FBI. See generally, IAS/IPU Letter. In the letter, the IAS/IPU responds to a May 2, 2023 communication from the plaintiff's counsel, Jennifer Freeman, which notified Freeman that the IAS/IPU "mandated [that] action be taken to address the concerns [Freeman] raised in [her] complaint" regarding, id. at 1, "law enforcement's handling of Epstein[,]" Compl. ¶ 21. As described above, this letter does not change the Court's conclusion that venue is not proper in the District of Columbia because the plaintiff's grievance stems back to the FBI field offices' handling of the Epstein investigation and not any decision made by the IAS/IPU office in Washington, D.C. See Sanchez ex rel. Rivera-Sanchez v. United States, 600 F. Supp. 2d 19, 21 (D.D.C. 2009) (explaining that "when conduct occurs in one district but has intended effects in another, 'the act occurs in the jurisdiction where its effects are directed.'") (quoting Reuber v. United States, 750 F.2d 1039, 1047 (D.C.Cir.1985), rev'd on other grounds, Kauffman v. Anglo–Am. Sch. of Sofia, 28 F.3d 1223 (D.C. Cir. 1994)).

Maxwell's misconduct and the FBI's failures," did not occur in the District of Columbia since the plaintiff does not allege she has ever resided here. Compl. ¶ 148. Accordingly, based on the "totality of events giving rise to [the] plaintiff's grievance[s]," Thornwell, 471 F. Supp. at 356, the Court concludes that venue is not proper in the District of Columbia.

### B. The Court's Discretion to Transfer This Case

Although the Court finds that venue is not proper in this Court, the interest of justice clearly directs that this case should be transferred pursuant to both 28 U.S.C. § 1406(a) and 28 U.S.C. § 1404(a). "28 U.S.C. § 1406(a) directs courts to dismiss [a] case or, alternatively, transfer it to a proper venue if transfer would 'be in the interest of justice.'" Bullock, 943 F. Supp. 2d at 58 (quoting 28 U.S.C. § 1406(a)). "Transfer based on improper venue is preferred over dismissal because 'procedural obstacles impede an expeditious and orderly adjudication . . . on the merits.'" Id. at 58 (second-set of internal quotations omitted) (quoting Sinclair v. Kleindienst, 711 F.2d 291, 293–94 (D.C. Cir. 1983)). Additionally, 28 U.S.C. § 1404(a) provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought[.]" In considering whether to transfer a case pursuant to § 1404(a), the court can consider:

> private interest considerations[, such as]: (1) the plaintiff's choice of forum, unless the balance of convenience is strongly in favor of the defendant[]; (2) the defendant's choice of forum; (3) whether the claim arose elsewhere; (4) the convenience of the parties; (5) the convenience of the witnesses of the plaintiff and defendant, but only to the extent that the witnesses may actually be unavailable for trial in one of the fora; and (6) the ease of access to sources of proof.
>
> [And,] [ ] public interest considerations[, such as]: (1) the transferee's familiarity with the governing laws; (2) the relative congestion of the calendars of the

> potential transferee and transferor courts; [and] (3) the local interest in deciding local controversies at home.

Shawnee Tribe, 298 F. Supp. 2d at 24; 15 Wright & Miller's Federal Practice & Procedure § 3847 (4th ed. 2026) ("[T]rial court[s] must consider and balance all the relevant factors to determine whether the litigation would proceed more conveniently and whether the interests of justice would be better served by transfer to a different forum.").

Because of the serious nature of the allegations in the plaintiff's Complaint and the fact that a substantially similar litigation is currently ongoing in the Southern District of Florida, for the following reasons the Court will transfer this case file to that District for an "efficient conduct of the suit." See Franz, 591 F. Supp. at 379. At the outset, the Court notes that the plaintiff herself desires to have her case remain in this Court due to her concerns about her current counsel and her health condition, see generally Farmer Letter; however, because the balance of convenience and efficiency clearly weigh in favor of the case being transferred to the Southern District of Florida, the Court regrets that the plaintiff's desire alone is an insufficient basis for her case to remain in the Court.

As the first basis for the Court's transfer decision, it finds that venue is proper in the Southern District of Florida since the plaintiff brings a claim pursuant to the FTCA based, in part, on her allegation that she "saw binders with images of nude teens and young women at Epstein's Palm Beach mansion" in Florida in the mid-1990s when she worked for Epstein. Compl. ¶¶ 81–92. After she witnessed this, and experienced other alleged harms, she "reported Epstein and Maxwell to law enforcement." Id. ¶ 112; see Sanchez ex rel. Rivera-Sanchez v. United States, 600 F. Supp. 2d 19, 22 (D.D.C. 2009) ("To transfer the action, the court must ensure as a preliminary matter that venue is proper and that the defendants are subject to personal

jurisdiction in the transferee forum."). The defendant also agrees that "the Southern District of Florida . . . appears to be a more suitable venue" for this case. Def.'s Resp. at 13–14 (arguing that "transferring this action to the Southern District of Florida will avoid unduly prejudicing the [defendant] with concurrent litigations that likely raise overlapping issues of fact and questions of law, lessen the strain on government resources, as well as potentially subject the [defendant] to conflicting rulings or judgments.").

Additionally, private and public considerations counsel in favor of transferring this case. The parties have not yet engaged in extensive motions practice nor has discovery begun. See Franz, 591 F. Supp. at 379 (assessing whether venue is proper by considering the amount of discovery conducted, the court's familiarity with the case, where the evidence lies, and where witnesses are located). Additionally, the court in the Doe I case in the Southern District of Florida recently resolved the defendant's motion to dismiss and lifted the stay of discovery "for the limited purpose of allowing the parties to engage in . . . limited jurisdictional discovery" on September 24, 2026. See Order at 8–9 (Sept. 23, 2026), Doe 1 v. United States, No. 25-cv-80880 (DSL), ECF No. 135; see generally public docket in Doe 1 v. United States, No. 25-cv-80880 (DSL) (RMM). And, as it appears from the public docket in Doe 1, the only discovery that has been approved to occur before September 24, 2026, is the deposition of Maria Farmer (the plaintiff here) due to her fragile health condition. See generally Order (June 3, 2026), Doe 1, No. 25-cv-80880 (RMM), ECF No. 109, (approving the plaintiffs' motion to depose Maria Farmer). Moreover, the operative complaint in Doe 1 is largely based on the plaintiffs' alleged injuries caused by Epstein and his co-conspirators and is similarly based on negligence-related allegations against the DOJ and its components, i.e., (Count 1) negligence under the voluntary undertaking doctrine and (Count 2) negligence under the zone-of-risk doctrine. See generally

Doe 1, No. 25-cv-80880 (DSL) (RMM), Fourth Amended Complaint, ECF No. 104; id. ¶ 17 (asserting that "[t]he complaints and tips of Ms. Farmer and Ms. Christiansen merely scratch the surface of the numerous ways the FBI and the [DOJ] learned definitively that [ ] Epstein was committing heinous sex crimes against women and children[.] . . . Unfortunately, the FBI and [DOJ] ignored that critical information, despite obligations to act.").[4] Accordingly, since the operative facts underlying both cases are substantially the same and the prayers for relief are both based on alleged negligent actions by the DOJ and its components, it would serve the interest of justice for a court in the Southern District of Florida to preside over both cases to avoid, inter alia, conflicting rulings in similar cases.

As for the convenience of the parties, this factor does not clearly favor either party. The plaintiff will seemingly have to travel, if necessary, both to this Court and to the Southern District of Florida, and the defendant is the federal government, so it will experience no difficulty litigating this case either in this District or in Florida. But, the convenience to the witnesses seems to slightly favor this case being transferred to the Southern District of Florida. This is because certain witnesses in this case will likely be FBI agents in both the New York field office and the Southern District of Florida office. Thus, the FBI agents in the Southern District of Florida office will face no inconvenience, and even though the New York field office agents will have to travel to the Southern District of Florida, they already will be required to do so in the Doe 1 case. Other witnesses in this case may very well be certain plaintiffs in the Doe 1 case, and therefore, those witnesses will not be unduly prejudiced by having to appear in both cases, one being their own case, in the Southern District of Florida.

[4] Additionally, paragraphs 77 through 131 of the Fourth Amended Complaint in Doe I detail the same allegations that the plaintiff has pleaded in this case. See id. ¶¶ 77–131.

Likewise, the "ease of access to the sources of proof," also favors transferring this case since the sources of proof will largely be the same as in the Doe 1 case. See Sheldon v. Nat'l R.R. Passenger Corp., 355 F. Supp. 2d 174, 180 (D.D.C. 2005) ("The sixth private interest consideration is the ease of access to sources of proof."). As to the relative congestion of the calendars of the potential transferee and the transferor courts, neither party provided the Court with any information regarding the relative level of congestion in the transferee court; however, according to data reported by the Administrative Office of the United States Courts, the total number of civil cases pending before members of the Southern District of Florida at the end of the 12-month period ending on March 31, 2025, was 3,847. See Admin. Off. Of the U.S. Cts., Table C-1: U.S. District Courts—Civil Cases Commenced, Terminated, and Pending During the 12-Month Period Ending March 31, 2025, https://perma.cc/3QLA-SYZG (last visited Sept. 24, 2026). Whereas, the number of cases pending before members of this court during that same reporting period was 5,243. Therefore, it appears that this factor also weighs in favor of this case being transferred to the Southern District of Florida.

Lastly, as to whether this Court or the Southern District of Florida have an interest in deciding this case, this factor weighs slightly in favor of transfer because the plaintiff has alleged that Epstein also abused girls in South Florida and therefore the people of South Florida may have an enhanced interest in observing the court proceedings in this case. See Compl. ¶¶ 162–70; Adams v. Bell, 711 F.2d 161, 167 (D.C. Cir. 1983) ("[I]n cases which touch the affairs of many persons, there is reason for holding the trial in their view and reach rather than in remote parts of the country where they can learn of it by report only") (quoting Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 509, (1947), superseded by statute on other grounds). Because this case presents a controversy of national interest and contains allegations that affected multiple

jurisdictions, including the Southern District of Florida, the Court sees no reason why the case needs to be litigated in this Court rather than in the Southern District of Florida.

For all the foregoing reasons, the Court finds that because this case could have been brought in the Southern District of Florida, the interest of justice weighs in favor of this case being transferred to the Southern District of Florida pursuant to both 28 U.S.C. § 1406(a) and 28 U.S.C. § 1404(a).

## IV. CONCLUSION

For the foregoing reasons, the Court concludes that the District of Columbia is not the proper venue for the adjudication of this case based on the totality of the events that comprise the plaintiff's Complaint. And, because this case could have been brought in the Southern District of Florida, the defendant concedes that this action should be transferred to the Southern District of Florida due to the overlapping issues of fact and questions of law, and there is a related case that was already transferred to the Southern District of Florida by the undersigned, this case is transferred to the Southern District of Florida in the interest of justice.

**SO ORDERED** this 25th day of September, 2026.[5]

REGGIE B. WALTON
United States District Judge

[5] The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.